IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

|  |  |
|---|---|
| UNITED STATES DEPARTMENT OF TREASURY,<br><br>    *Plaintiff*;<br><br>v.<br><br>NATIONAL TREASURY EMPLOYEES UNION CHAPTER 73<br><br>    *Defendant*. | Case No. _____ |

**COMPLAINT FOR DECLARATORY RELIEF**

**PRELIMINARY STATEMENT**

1. Since taking office, two of President Trump's top priorities for his Administration have been to improve the efficiency and efficacy of the federal workforce, and to promote the national security of the United States. Unfortunately, many Executive Branch departments and agencies have been hamstrung in advancing both of those important efforts by restrictive terms of collective bargaining agreements (CBAs).

2. These CBAs significantly constrain the Executive Branch, restricting how agencies hire and manage employees. They also effectively delegate important decision-making to unaccountable private arbitrators in the form of grievance arbitration. Virtually all limit the power of the President and his Executive Branch officials to promptly identify and address underperformance, thus impeding the President's Take Care Clause responsibility under Article II of the Constitution. And for agencies and employees that work on national security matters, these CBAs also impinge on the President's efforts to protect the United States from foreign and domestic threats.

1

3.     Public servants, appointees, and officials come to work every day advancing the public interest, serving the American people, and furthering the President's agenda with energy. Like every large workforce, they deserve strong leadership and accountability that recognizes great performance and winnows out inefficiency. When inflexible CBAs obstruct presidential and agency head capacity to ensure accountability and improve performance, all citizens pay the price.

4.     And the price is particularly intolerable when national security is on the line. One of the President's most important responsibilities is to oversee national security, investigative, and intelligence efforts on behalf of the United States and the American public. *See* U.S. Const. art. II, §§ 1, 2, 3. The President commands our nation's defense and military capabilities. He necessarily does so through executive agencies and subdivisions that hold a primary function in supporting that important work, including by protecting and preserving our nation's military, economic, and productive strength. In exercising those critical functions, the President and his senior Executive Branch officials cannot afford to be obstructed by CBAs that micromanage oversight of the federal workforce and impede performance accountability.

5.     Congress acknowledged as much. It acted to protect and preserve the Executive Branch's flexibility in these realms by including significant carveouts in the collective bargaining statutes administered by the Federal Labor Relations Agency (FLRA).

6.     In particular, Congress expressly excluded some agencies, including the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Secret Service, and certain others from collective bargaining. 5 U.S.C. § 7103(a)(3). But recognizing the President's broad discretion to promote and protect national security and the national interest, Congress further empowered the President to issue an order excluding "*any* agency or subdivision thereof" from collective-bargaining requirements if the President determines that the entity has intelligence, counterintelligence, investigative, or national security work as "*a* primary function,"

2

and that collective-bargaining requirements cannot be applied to the entity consistent with both national security "requirements and *considerations*." 5 U.S.C. § 7103(b)(1) (emphases added). The statute, in other words, authorizes the President to exempt certain segments of the federal workforce from federal labor-law requirements.

7. In an Executive Order entitled *Exclusions from Federal Labor-Management Relations Programs* signed yesterday, President Trump made this necessary determination for the Department of the Treasury ("Treasury"), including most of its subdivisions, such as the Internal Revenue Service (IRS).

8. The Office of Personnel Management (OPM), which coordinates federal workforce policy, has since issued guidance encouraging the agencies and subdivisions covered by the Executive Order to take appropriate steps toward terminating their previously negotiated CBAs—and, once they have done so, to adopt certain personnel policies that align with the President's priorities, including expediting procedures for removing underperforming employees.

9. In light of the Executive Order and OPM guidance, Plaintiff now respectfully seeks a declaratory judgment from this Court that it has the power to rescind or repudiate the national CBA, as well as local supplemental agreements and MOUs (collectively, CBAs) with the National Treasury Employees Union (NTEU) and Defendant, one of the local chapters of NTEU that implements and executes the terms of the CBA in Kentucky.

10. Plaintiff wishes to rescind or repudiate those agreements, including so it can protect national security by developing personnel policies that otherwise would be precluded or hindered by the CBAs. But to ensure legal certainty and avoid unnecessary labor strife, it first seeks declaratory relief to confirm that it is legally entitled to proceed with doing so.

## JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. § 1331, because this dispute involves a question of federal law under federal statutes and the Executive Order. *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 197 (2014). This Court also has jurisdiction under 28 U.S.C. § 1345.

12. In conjunction with its request for the remedy of a declaratory judgment, Plaintiff asserts that the Executive Order and its operation under the Federal Service Labor-Management Relations Statute vitiates its CBA with National Treasury Employees Union, which Defendant implements and enforces, and its CBAs negotiated directly with Defendant. Further, Plaintiff's potential termination of the relevant CBAs—through implementation of the Executive Order and subsequent implementing steps as specified by OPM—would create a conflict with continued federal union operation under the existing CBAs. Plaintiff consequently requests a declaration from this Court that the President has lawfully, within the contours of his statutory discretion under 5 U.S.C. § 7103(b)(1), applied the national security exception through his expressed discretionary assessment and determination that the specified agencies and subdivisions are exempt from statutory CBA requirements.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant National Treasury Employees Union Chapter 73 resides in this judicial district and represents IRS employees in Kentucky from its Covington base of operations, and because the relevant CBAs were ratified, managed, and/or performed within Kentucky, including in this judicial district.

14. The IRS employs and supervises employees covered by the relevant CBAs for work performed within this judicial district and within the jurisdiction overseen by Defendant NTEU Chapter 73.

## PARTIES

15. Plaintiff United States Department of Treasury is an executive agency headquartered at 1500 Pennsylvania Ave NW, Washington, DC 20220. The Internal Revenue Service (IRS) is one of Plaintiff Treasury Department's subordinate agencies.

16. Defendant National Treasury Employees Union Chapter 73 represents IRS employees in Covington, Kentucky. Chapter 73 is headquartered in Covington, KY.

## BACKGROUND

**I.     Statutory Background**

17. In 1978, Congress enacted the Federal Service Labor-Management Relations Statute ("FSLMRS"). *See* 5 U.S.C. § 7101 *et seq.*

18. Although the FSLMRS generally grants federal agency employees the right to organize and collectively bargain, it also provides that the President "may issue an order excluding any agency or subdivision thereof from coverage of this chapter [5 U.S.C. ch. 71] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b).

19. The FSLMRS does not define "national security work" or "investigative work" for purposes of the exemption, but the Federal Labor Relations Act (FLRA) has adopted plain text meanings and has provided some guidance in related contexts on the meaning of these terms.

20. In particular, a 2014 FLRA decision upheld the ruling of a regional director who applied a "standard dictionary definition" of "investigative work" to mean work that involves "search[ing] into so as to learn the facts; inquir[ing] into systematically."

21. As to "national security work," FLRA precedent dating back to the Carter Administration defines national security as "those sensitive activities of the government that are directly related to the protection and preservation of the military, economic, and productive strength of the United States, including the security of the Government in domestic and foreign affairs, against or from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense."

## II. Executive Order and OPM Guidance

22. On March 27, 2025, the President issued an Executive Order entitled *Exclusions from Federal Labor-Management Relations Program*.

23. In Section 2 of the Executive Order, the President determined that certain agencies and subdivisions have as a primary function intelligence, counterintelligence, investigative, or national security work. As relevant here, the President determined that the entire U.S. Department of the Treasury, except the Bureau of Engraving and Printing, has such primary functions.

24. The President determined that the FSLMRS cannot be applied to these agencies and subdivisions in a manner consistent with national security requirements and considerations.

25. On March 27, 2025, OPM issued guidance regarding the Executive Order. In that guidance, OPM opined that the covered agencies "are no longer required to collectively bargain with Federal unions" and that "the statutory authority underlying the agency's original recognition of the relevant unions no longer applies," so those unions are no longer exclusive representatives of the agency employees. OPM directed covered agencies to "consult with their General Counsels as to how to implement the President's directive" in the Executive Order, and to consider and implement changes that are "consistent with the President's national security determination."

26. OPM also stated that after terminating their CBAs, agencies should promptly align their workforce operations with President Trump's policies and management priorities, including

6

strengthening performance accountability by making it easier to remove underperforming employees, imposing a return to in-office work, and more.

### III. Treasury and Its Restrictive and Onerous CBAs

27. Plaintiff agency the U.S. Department of the Treasury is an agency covered by the Executive Order. IRS, as one of Treasury's subdivisions, is therefore covered by the Executive Order.

28. IRS employs hundreds of employees represented by Defendant who work in its facilities in Covington, Kentucky.

29. Treasury and IRS have previously executed a national CBA with NTEU, Defendant's parent organization, along with local agreements and MOUs executed with Defendant directly. These agreements (collectively, CBAs) remain currently in effect and cover IRS employees in Covington, Kentucky. They impose demanding burdens on the Plaintiff, and per the President's directive, undermine his authority to supervise and direct agencies with a primary function of advancing the country's national security, intelligence, counterintelligence and investigative work. The Plaintiff therefore wishes to rescind or repudiate them.

30. As a general matter, and as discussed in more detail below, CBAs give hostile unions powerful tools to prevent changes to agency operations they oppose. These CBAs likewise interfere with the President's ability to oversee the Executive Branch and limit his authority to oversee agents executing and implementing initiatives related to his core executive power, including as to national security.

31. CBAs operate as binding legal instruments that take precedence over conflicting agency regulations. Agencies cannot even implement government-wide rules and regulations—including executive orders—that conflict with extant CBAs. Policies embedded in a CBA are thus locked in place until the agreement expires and, if it has a continuance clause, is fully renegotiated.

7

32.     The Biden Administration renegotiated many CBAs to last through most or all of President Trump's second term. As relevant here, the IRS-NTEU National Agreement will remain in effect until October 1, 2027—nearly three quarters of the way through President Trump's second term.

33.     Consequently, the Trump Administration cannot alter IRS policies on, *e.g.*, promotions or hiring, that are embedded in the national agreement, even if the President believes they are a serious impediment to effective agency operations and thus national security.

34.     Bargaining obligations also stall many policy changes. Even if an agency wants to alter working conditions in ways that do not violate a CBA, it must give its union an opportunity to negotiate over the change. If the union chooses to bargain, the agency cannot make any changes until midterm bargaining concludes—a process that can take a year or more if negotiations go to impasse proceedings.

35.     FLRA case law is filled with decisions holding that agencies could not implement unilateral changes without seeking preclearance from union representatives or completing midterm bargaining.

36.     In short, unions that oppose an administration's agenda can freeze the status quo in place for protracted periods by demanding midterm bargaining and dragging it out to impasse. Unions hostile to the President's agenda can thus block or at least significantly delay the implementation of management policies that he considers necessary to ensure the effective and efficient operations of agencies—including, as relevant here, an agency with investigative and national security responsibilities. That, in turn, undermines the President's authority to supervise his agents and threatens our Nation's security.

37.     The President cannot effectively execute the laws or promote national security if his supervision of agents engaged in national security, intelligence, counterintelligence, or

8

investigative missions is stymied by intrusive bargaining agreements and continuous bargaining obligations. Congress therefore recognized the President's power to exempt agencies or sub-agencies from the statutes authorizing such bargaining agreements.

38. The IRS is a subdivision of the Department of the Treasury that is covered by the Executive Order because the President determined that it engages in investigative and national security work as primary functions, and that the relevant collective bargaining provisions could not be applied to IRS consistent with national security requirements and considerations.

39. The IRS straightforwardly has as investigative work as a primary function. It audits tax returns and otherwise investigates tax evasion. It also investigates money laundering, fraud, and other financial crimes.

40. The IRS also has as a primary function national security work, as the FLRA has long understood that term. The IRS primarily exists to collect the taxes that fund government operations, including the operations of the U.S. military. This directly preserves America's military strength.

41. History bears out this understanding. The Revenue Act of 1862 created the Internal Revenue Service (then called the Office of the Commissioner of Internal Revenue) to raise the funds necessary to finance the Civil War, end slavery, and preserve the Union.

42. The IRS also performs essential national security work in combatting financial crimes—including terrorist financing—and enforcing economic sanctions. The IRS further protects vast amounts of sensitive taxpayer and financial information from cyber threats.

43. Indeed, during the Obama Administration the FLRA concluded that "it is undisputed that Officers [who guard IRS computer facilities] are engaged in security work that involves national security." *See U.S. Dep't of Treasury Internal Rev. Serv. & Nat'l Treasury Emps. Union*, 65 F.L.R.A. 687, 693 (2011).

9

44. Treasury and IRS have entered into CBAs with Defendant. Specifically, the 2022 National Agreement was negotiated between Plaintiff and NTEU, Defendant's parent organization. *2022 National Agreement, Internal Revenue Service and National Treasury Employees Union*, https://www.jobs.irs.gov/sites/default/files/nho_documents/2022-National-Agreement.pdf. NTEU and Plaintiff subsequently negotiated a 2025 Addendum to the 2022 National Agreement, finalizing it shortly before President Trump took office for his second term. Plaintiff also negotiated multiple local-level agreements with Defendant NTEU Chapter 73.

45. Defendant NTEU Chapter 73 has primary responsibility for implementing both the national and local-level agreements in this judicial district, and for enforcing Plaintiff's compliance with them.

46. The 2025 Addendum authorizes the President of NTEU Chapter 73 and as many stewards "as the Chapter deems appropriate" to act on the union's behalf in this regard. *2025 Addendum* at 1. Plaintiff must furnish Defendant NTEU Chapter 73's president and stewards official time during duty hours to perform activities on behalf of the union enforcing and implementing the National agreement and local agreements. *Id*.

47. These activities include conferring with employees to prepare grievances, formal grievance discussions with IRS on behalf of such employees, presenting or discussing unfair labor practice charges with IRS, being present during Plaintiff's examinations of employees that may lead to disciplinary actions, collective bargaining negotiations with Plaintiff, and participation in union training activities. *Id*. at 1-2.

48. Defendant NTEU Chapter 73 is authorized to directly present local institutional grievances against Plaintiff. *2022 National Agreement* at 147.

10

49. Defendant is party to and/or enforces agreements with Plaintiff that have seriously burdened Plaintiff's operations. The CBAs include numerous terms that materially restrict Plaintiff's ability to govern and set policies for its own workforce.

50. For example, the CBAs require Plaintiff to "provide first consideration to IRS employees for bargaining unit vacancies" before considering external candidates. *Id.* at 50. That provision prohibits Plaintiff from giving equal consideration to internal and external candidates, even if it believes external candidates have necessary skills or perspectives.

51. The CBAs further pressure hiring officials to default to promoting employees through an automatic ranking and rating system. IRS must give in person interviews to all candidates for promotion if the agency diverges from this system's ranks. For example, the CBAs require that "if the Employer selects the top twenty (20) candidates on a promotion certificate of 100 candidates, and the Employer decides to interview the twenty-fifth ranked employee, it will then be required to interview the candidates ranked twenty-one (21) through one-hundred (100)." *Id.* at 56. This can make it prohibitively burdensome for Plaintiff to give employees individualized consideration for promotion.

52. Like most CBAs, the National Agreement requires extensive Performance Improvement Periods (PIPs) before Plaintiff can separate employees for poor performance using the procedures of Chapter 43 of title 5, United States Code. Even though President Trump has determined that 30-days is an appropriate PIP duration, the CBAs require PIPs to be at least 60 days. *Id.* at 142.

53. The CBAs further require IRS to "provide formal notice to the Union that it has determined a RIF [Reduction in Force] is necessary as early as practicable but no later than twelve (12) months in advance of the off-rolls date for any RIF." *Id.* at 79. This has the effect of forcing

11

Plaintiff to wait a year before undertaking RIFs that the President believes are necessary for effective and efficient agency operations.

54. A recent letter from NTEU National President Doreen Greenwald to the Acting IRS Commissioner confirms the union "vehemently opposes" any reductions in force and plans to use this contract provision to resist this administration policy. *Letter from Doreen Greenwald to Max R. Wyche of March 14, 2025*, 1. https://www.nteu.org/-/media/Files/nteu/docs/public/letters/2025/IRS%20Art%2019%20RIF%20Ltr.pdf.

55. The CBAs that Defendant implements and enforces significantly restrict the President's ability to manage the IRS as he deems best to fulfill its important investigative and national security missions.

## COUNT I
### (FSLMRS AND 28 U.S.C. § 2201)

56. Plaintiff reassert the allegations set forth above in paragraphs 1–55.

57. The Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The Act serves an important function by allowing parties to seek legal clarity and resolve concrete disputes without taking actions that would expose them to potential liability (for example, by breaching or repudiating a contract, infringing a patent, or violating a statute). *See generally MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).

58. Here, the President has issued an Executive Order, entitled *Exclusions from Federal Labor-Management Relations Programs*, which excludes certain agencies and subdivisions thereof from coverage under 5 U.S.C. Chapter 71, including Treasury and its subdivisions, like IRS. Plaintiff believes that, pursuant to that Executive Order, it may rescind or repudiate the CBAs described above. And Plaintiff wishes to rescind or repudiate those CBAs, because they prevent Plaintiff from adopting personnel policies that align with the President's priorities and interfere

12

with the President's direction of an agency engaged in sensitive operations implicating national security and investigative functions.

59. An actual controversy has arisen and now exists between the parties concerning the rights and obligations of Plaintiff under the terms of the extant CBAs. Pursuant to those agreements, Plaintiff must provide a year's notice before conducting a RIF; must use two-month PIPs for underperforming employees before proposing termination or removal in contravention of Administration priorities; must give first priority to internal candidates for vacancies; and is forced to incur various other pecuniary, logistical, and procedural burdens on operations.

60. Plaintiff disputes its obligation to continue abiding by the terms of the CBAs because it has been exempted from the FSLMRS by the President's Executive Order issued pursuant to 5 U.S.C. § 7103(b). That exemption has the legal effect of voiding the extant CBAs. *See Pioneer Natural Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4-487*, 338 F.3d 440, 441 (5th Cir. 2003) ("When the NLRB decertified the Union on September 18, 2000, the CBA automatically terminated by operation of law."). And that basis for the invalidity of the CBAs arises under federal law, 5 U.S.C. § 7101 *et seq.* together with the Executive Order.

61. But Defendant assuredly will not agree that the CBAs can be lawfully rescinded or repudiated. Indeed, Defendant's parent organization recently advised the Administration that "any action by the IRS seeking to comply with the OMB and OPM guidance [calling for RIFs], including … conducting any RIF by September 30 of this year or sooner, would violate Article 19 of the parties' 2022 National Agreement … [and] constitute a repudiation of the Article and an unfair labor practice under the Federal Service Labor-Management Relations Statute." *Letter from Doreen Greenwald to Max R. Wyche of March 14, 2025*, 3 https://www.nteu.org/-/media/Files/nteu/docs/public/letters/2025/IRS%20Art%2019%20RIF%20Ltr.pdf. The NTEU

further asked Plaintiff to "confirm at [its] earliest convenience IRS's commitment to follow its lawful obligations under Article 19 [governing RIFs]." *Id*.

62. There is accordingly a concrete and immediate dispute over the rights of the parties, leaving IRS with uncertainty regarding its power to terminate the subject CBAs pursuant to the Executive Order. A declaratory judgment is thus appropriate to ratify that Plaintiff need not continue abiding by the personnel, promotion, unacceptable performance, RIF and other policies imposed by the subject CBAs.

63. The Court should declare that Plaintiff does have the power and authority under the Executive Order to rescind or repudiate the subject CBAs. The Executive Order was lawful under 5 U.S.C. § 7103(b). Through the Executive Order, the President has determined that IRS, as a subdivision of Treasury, has "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1)(A). The President has further determined that the provisions of 5 U.S.C. Chapter 71 cannot be applied to IRS "in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1)(B). The Executive Order thus properly excludes IRS from coverage under 5 U.S.C. Chapter 71.

64. Because the IRS has been properly excluded from coverage under 5 U.S.C. Chapter 71, Plaintiff is free to rescind or repudiate CBAs that Defendant implements and enforces. The statutory provisions that make the CBAs binding on agencies are no longer applicable to Plaintiff. 5 U.S.C. § 7114(c)(3). And once repudiation is accomplished, Treasury and IRS will no longer be bound by the terms of the CBAs, and Defendant will have no authority to implement or enforce such CBAs against Treasury and IRS. Plaintiff will also no longer have a duty to engage in collective bargaining with certain of their employees, and Defendant can no longer represent the employees in collective bargaining.

65.     For the reasons described above, the Court should declare that Plaintiff has the power to terminate the subject CBAs pursuant to the Executive Order.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

1. Declare that Plaintiff is authorized to terminate its CBAs pursuant to the Executive Order and OPM's implementing guidance; and

2. Award such other relief as the Court deems equitable and just.

Dated: March 28, 2025

                                        Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

*/s/ Emily Hall*_____
EMILY HALL (D.C. Bar No. 1780317)
Counsel to the Assistant Attorney General
Civil Division, United States Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel: (202) 307-6482
Fax: (202) 514-8071
emily.hall@usdoj.gov

ALEXANDER K. HAAS
Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director, Federal Programs Branch

LISA ZEIDNER MARCUS
Senior Counsel, Federal Programs Branch

*Counsel for Plaintiffs*