The UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

CIVIL ACTION NO.: 2:25-049-DCR

UNITED STATES DEPARTMENT OF TREASURY                    PLAINTIFF

VS.             **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

NATIONAL TREASURY EMPLOYEES
UNION CHAPTER 73                                         DEFENDANT

*** *** *** *** ***

Comes Plaintiff the United States Department of Treasury (the Department), by counsel, and hereby moves this Court pursuant to Federal Rule of Civil Procedure 56(a) for an Order of summary judgment in favor of the Department.

The Federal Service Labor-Management Relations Statute (FSLMRS or Statute), which governs bargaining with public-sector labor unions, authorizes the President to exempt from its coverage "*any* agency or subdivision thereof" if the President makes the determinations that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and that the provisions of the statute "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1). Since 1979, when President Carter exempted more than forty-five agencies or subdivisions pursuant to that authority, every President (other than President Biden) has issued one or more executive orders exempting additional agencies and subdivisions from the statute's coverage in response to the nation's changing needs.

On March 27, 2025, President Trump issued such an order. In Executive Order 14,251,

*Exclusions from Federal Labor Management Relations Program*, the President made the determinations specified in the FSLMRS, thereby excluding the identified agencies and agency subdivisions from its coverage. Among the agencies covered by Executive Order 14,251 is the Department and its subdivisions except the Bureau of Engraving and Printing. The Department's national security role is clear, primary, and longstanding. It exists to promote the economic and productive strength of the United States—a mission essential for the preservation of national security. Further, the Internal Revenue Service (IRS), a bureau of the Department, was first established in 1862, precisely to collect the funds necessary to prevail during the nation's civil war, and since that time has collected revenue critical to all of our nation's governmental functions, of which national security and defense is paramount.

On March 28, 2025, the Department brought this suit seeking a declaratory judgment that it has the power to terminate the national collective bargaining agreement and local supplemental agreements or memoranda of understanding (MOUs) (collectively, CBAs) with the National Treasury Employees Union (NTEU) and Defendant, NTEU Chapter 73, which represents over two thousand IRS employees in Northern Kentucky and has principal responsibility in this region for implementing and enforcing the CBAs against the IRS. Questions of law predominate and there are no disputed material facts. For these reasons and as discussed further below, the Department requests that the Court grant summary judgment in its favor and issue declaratory relief. Because Executive Order 14,251 is a valid exercise of the President's authority under the FSLMRS, 5 U.S.C. § 7103(b)(1), the Court should declare that the Department is authorized to terminate its CBAs pursuant to the Executive Order.

## BACKGROUND

### I.   The President's Authority to Control the Conduct of Federal Employees

Article II of the Constitution provides that "[t]he executive Power shall be vested in a

President of the United States of America." U.S. Const., art. II, § 1, cl. 1. This power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), and includes the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965). Congress has further recognized this aspect of Executive power by enacting, *inter alia*, 5 U.S.C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."

Before Congress enacted the FSLMRS in 1978, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees[]" by Executive Order. *See, e.g., Local 1498, AFGE v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975). "This was a project of the Executive, and not of the Congress." *Manhattan-Bronx Postal Union*, 350 F.2d at 452. Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations when he issued Executive Order No. 10,988, in 1962. Exec. Order No. 10,988, 27 Fed. Reg. 551 (Jan. 19, 1962); *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91–92 (1983) ("*BATF"*). Multiple Presidents subsequently amended that Order. *See* Exec. Order No. 11,491, 34 Fed. Reg. 17,605 (Oct. 31, 1969), as amended by Exec. Orders No. 11,616, 36 Fed. Reg. 17,319 (Aug. 28, 1971), Exec. Order 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971), and Exec. Order No. 11,838, 40 Fed. Reg. 5,743, 7,391 (corrected) (Feb. 7, 1975).

## II. The FSLMRS Framework and Related Executive Orders

Against this backdrop, Congress in 1978 passed the FSLMRS, 5 U.S.C. § 7101 *et seq*. The statute, enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat.

111, provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees." *BATF*, 464 U.S. at 91. The FSLMRS establishes the right of certain federal employees to form or join a labor union, among other protections. However, the Statute exempts certain agencies and matters from its coverage. 5 U.S.C. § 7103(a)(3) (excluding from coverage the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency, among others). The FSLMRS also empowers the President to exempt additional agencies from its requirements: It provides that "[t]he President may issue an order excluding *any* agency or subdivision thereof from coverage under [the Statute] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the Statute] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1) (emphasis added).

Pursuant to this authority, President Carter issued an executive order in 1979 excluding from FSLMRS coverage more than forty-five agencies or agency subdivisions, precluding those agencies' and subdivisions' employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Every President since then, with the sole exception of President Biden, has issued similar executive orders adding to that list in response to changing circumstances and the evolving investigative and national security responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002); Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,760, 73 Fed. Reg. 73,991 (Jan. 17, 2017).

Like these other Presidents, on March 27, 2025, President Trump issued another such Executive Order. *See* Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025). In Section 2 of the Executive Order, the President determined that certain agencies and subdivisions—

4

including the Department other than the Bureau of Engraving and Printing—have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the FSLMRS cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations.

### III.   Office of Personnel Management Guidance and the Department's Implementation of Executive Order 14,251

On March 27, 2025, the Office of Personnel Management ("OPM") issued guidance to federal agencies regarding Executive Order 14,251. *See* Decl. of Allen R. Brooks ¶ 4 ("Brooks Decl."), filed in *Nat'l Treasury Emps. Union v. Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 11, 2025), ECF No. 26-1, and attached here as Exhibit 1; Mem. from Charles Ezell, Acting Director, OPM to Heads and Acting Heads of Departments and Agencies (Mar. 27, 2025), attached as Exhibit 1-A. In that guidance, OPM expressed the legal position of the Administration that under a lawful implementation of the President's Executive Order the covered agencies would be "no longer required to collectively bargain with Federal unions" and that "the statutory authority underlying the original recognition of the relevant unions no longer applies." Ex. 1-A at 3. Consequently, those unions are no longer exclusive representatives of the agency employees and the relevant agency would not have to select or recognize an exclusive bargaining representative. OPM directed covered agencies to "consult with their General Counsels as to how to implement the President's directive" in the Executive Order, and to consider and implement changes that are "consistent with the President's national security determination." *Id.* at 3.

The Department is one such covered agency. It has previously executed multiple collective bargaining agreements (CBAs) (including local agreements and MOUs) that remain currently in effect and cover IRS employees. The CBAs impose demanding burdens on the Department, and per the President's directive, undermine his authority to supervise and direct the Department, an

agency with a primary function of advancing the country's national security and investigative work.

On April 8, 2025, the Chief Human Capital Officers Council (CHCOC), an interagency forum led by the OPM Director, shared with agencies, including the Department, a Frequently Asked Questions (FAQs) document that addresses agency questions concerning the implementation of Executive Order 14,251. *See* Brooks Decl. ¶ 4. Within the CHCOC FAQs document were the following key points of advice to federal agencies:

> ➢ Agencies should not terminate any collective bargaining agreements ("CBAs") until the conclusion of litigation or further guidance from OPM directing such termination.

> ➢ Agencies should not file any decertification petitions until litigation regarding the Executive Order has been resolved.

> ➢ Agencies should ask the Federal Labor Relations Authority to hold cases where an arbitrator ordered relief for a bargaining unit covered under the Executive Order in abeyance pending the outcome of litigation, where practicable.

*Id.* ¶ 6; *see also* Frequently Asked Questions: Executive Order 14251:"Exclusions from Federal Labor-Management Relations Programs" (April 7, 2025), attached as Exhibit 1-B. Consistent with the guidance in the CHCOC FAQs document, Treasury has not terminated CBAs pursuant to Executive Order 14,251. Decl. of Trevor Norris ¶ 9 ("Norris Decl."), attached as Exhibit 2. However, the Department wishes to implement a number of policies that are crucial to meeting its primary national security purpose, but that are prohibited by the terms of the CBAs. For example, the Department intends to enact changes to its personnel management and recruitment operations but would be prohibited from doing so under the CBAs' provisions related to separating underperforming employees and promotion of internal candidates. *See* Decl. of Geralda Larkins ¶¶ 7(b), (e) ("Larkins Decl."), attached as Exhibit 3. Additionally, the Department seeks to swiftly implement certain discretionary but necessary changes, such as work assignments

or facilities management, but the CBAs' bargaining requirements by their terms purport to restrict the Department from taking a dynamic approach to rapidly changing conditions, see *id.* ¶¶ 7 (d), (f), which is crucial in the national security context.

## IV. Defendant

Defendant represents over two thousand IRS employees at three locations in Northern Kentucky: the CSC Annex Building in Florence, the CSC Gateway Center in Covington, and the CSC Gateway West in Covington. *Id.* ¶ 4. Defendant is covered by the IRS and NTEU 2022 National Agreement and the 2025 Addendum to the National Agreement, both of which also apply to IRS bargaining unit employees nation-wide. The Department is further subject to local agreements and MOUs specific to Defendant. Defendant, not the NTEU national organization, is primarily responsible for enforcing the CBAs in the Covington, Kentucky region, which is in this judicial district. *See id.* ¶ 4. As detailed below, these CBAs contain onerous and burdensome provisions that restrict the Department's ability to implement policies necessitated by its mission and operations. *Id.* ¶¶ 7–11.

The FSLMRS and CBAs empower Defendant to burden and restrict the IRS's discretion as it pertains to managing employees in the covered locations. For example, under the National Agreement, Defendant decides whether to pursue local institutional grievances and many types of mass grievances against Plaintiff. IRS & NTEU, 2022 National Agreement 146–147, https://www.jobs.irs.gov/sites/default/files/nho_documents/2022-National-Agreement.pdf ("2022 National Agreement"). The grievance process can be invoked by Defendant for nearly "any matter relating to the employment of any employee," including issues such as disagreements over performance evaluations or a decision to require employees to return to work in-person. 2022 National Agreement at 145; *see also* Larkins Decl. ¶ 10. In some cases, Defendant can pursue these grievances all the way through arbitration and an appeal to the FLRA, a lengthy and time-

consuming process. *See* 5 U.S.C. § 7122. Defendant alone currently has nearly thirty open grievances against the IRS—three of which have advanced to the arbitration stage. Larkins Decl. ¶ 10. These grievance disputes relate to, among other things, IRS decisions not to promote a specific employee and IRS's refusal to provide an employee a fully remote work option. *See id.* The Department requires the discretion to make such policy decisions without the threat of having to defend its decisions against challenges by Defendant. *See id.*

The CBAs impose obligations on the Department to contribute time and resources to union activities, which are not related to its mission and priorities. *See id.* For example, the Department must provide "official time" during duty hours for Defendant's President and stewards to conduct union activities. *Id.* ¶ 9. In fact, Defendant currently has over thirty union stewards who collectively received over fifteen thousand hours of "official time" in Fiscal Year 2024. *Id.* The IRS is also obligated to respond to requests for information from Defendant and provide Defendant with additional agency resources, such as travel, per diems, office space and furnishings to perform these functions. *Id.* ¶ 8; 2022 National Agreement 23–26, 33; *see also* 5 U.S.C.§ 7114. These requirements divert resources from the Department's primary mission. *See* Larkins Decl. ¶¶ 8, 9.

The CBAs also constrain the Department's discretion in reassigning or realigning work priorities. The Department cannot unilaterally reassign employees represented by Defendant within their current post-of-duty until it has notified and completed negotiations with Defendant, including any applicable impasse proceedings. Larkins Decl. ¶ 7(d); *see also* 5 U.S.C. §§ 7106(b), 7119. And, the Department similarly cannot make changes to work procedures or reorganizations within a single geographic area represented by Defendant without providing such notifications and completing such negotiations. Larkins Decl. ¶ 7(d); 2022 National Agreement at 165–167; *see also* 5 U.S.C. §§ 7102(2); 7116(a). Further, the Department must provide Defendant with proposed changes to performance standards at least two weeks in advance of their implementation. 2022

8

National Agreement at 46; *see also* Larkins Decl. ¶ 7(a). Given these burdens and restrictions, the Department filed the present lawsuit seeking a declaratory judgment to clarify its rights and obligations as it pertains to the relevant CBAs.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 477 U.S. at 324; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999).

"Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 247 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249; *Matsushita Elec.*, 475 U.S. at 586 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006). Summary judgment is appropriate even before discovery when there are no genuine disputes of any material facts and the only issues to be decided are questions of law. *See Toms v. Taft*, 338 F.3d 519, 523 (6th Cir. 2003) (holding that "the district court did not abuse its discretion by granting summary judgment before discovery had commenced" when "[t]he basis for the district court's decision was . . . a purely legal question").

## ARGUMENT

The question before this Court is whether the President made the determinations authorized by FSLMRS, 5 U.S.C. § 7103(b), which the President plainly did. The Court lacks authority to look behind and review the President's national security-related determinations under § 7103(b). But in any event, the President's determinations are supported. Accordingly, the Department is entitled to summary judgment and a declaration that it is authorized to terminate its CBAs pursuant to the Executive Order.

## I.    The President's § 7103(b)(1) Determinations Are Authorized by Statute and Not Subject to Judicial Review.

Executive Order 14,251 represents the President's exercise of his authority under 5 U.S.C. § 7103(b)(1) to exclude certain agencies or subdivisions from the provisions of Chapter 71 of Title 5. The statute provides:

> The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—

(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1).

As Executive Order 14,251 makes plain, the President determined that each covered agency or subdivision has a relevant primary function, and he determined that Chapter 71's provisions could not be applied to that agency or subdivision in a manner consistent with national security requirements and considerations. And as the statute makes plain, Congress vested the President—and the President alone—with the authority to exclude agencies or subdivisions from Chapter 71's coverage. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum[.]"). This Court lacks authority to second guess the President's determinations.

Courts have repeatedly recognized that § 7103(b)(1) entrusts the relevant determinations to the President alone, without interference from courts or other actors. The District Court for the District of Columbia held decades ago that a § 7103(b)(1) exclusion by President Carter was "not reviewable" because "Congress intended the chief executive to act 'in his or her sole discretion'" when making § 7103(b)(1) determinations. *Nat'l Treasury Emps. Union v. Reagan*, 1981 WL 150530, at *2 (D.D.C. Sept. 3, 1981) (quoting 124 Cong. Rec. H.9633 (daily ed. Sept. 13, 1978)). There, the Court concluded that "Congress granted the President complete discretion in determining the agencies to be excluded from the labor relations provisions," *id.*, leaving judicial review of the President's determinations available only in "instances of constitutional dimension

11

or gross violation of the statute." *Id.* at *2–3 (quotation omitted).[1]

The D.C. Circuit has echoed that conclusion, observing that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist." *AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989). And the D.C. Circuit has cautioned that others must not "arrogate … the President's power in this regard;" instead, § 7103(b)(1) "is for the President alone to invoke." *Dep't of Def. v. FLRA*, 685 F.2d 641, 650 (D.C. Cir. 1982).

Indeed, the President need not even "insert written findings in an exempting order[]" under § 7103(b)(1). *AFGE*, 870 F.2d at 727. If the President's order can be sustained without *any* findings, the statute surely does not permit second-guessing or flyspecking of findings actually made. Any other conclusion would be flatly inconsistent with the deference regularly due to the President's national security-related determinations. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (dismissing as "inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e national security] sphere" an argument "for a searching inquiry into . . . the President's justifications" for a finding about national interests); *Webster v. Doe*, 486 U.S. 592, 600 (1988) (concluding that a statute authorizing the CIA Director to terminate an employee when the Director "shall deem such termination necessary or advisable in the interests of the United States" forecloses "any meaningful judicial standard of review"); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 103 (D.D.C. 2018) (*Webster* retains vitality in "the context of national security"). In sum, "[w]hen it comes to collecting evidence and drawing factual inferences" on questions of

---

[1] *Reagan* suggested that this exception *may* exist, but did not apply it. But in other contexts, courts have suggested that when judicial review is available only for "gross violations," that "narrow" exception applies only where the action is "plainly beyond the bounds" of the governing statute. *Air Line Emps. Ass'n, Int'l. v. Nat'l Mediation Bd.*, 1981 WL 2391, at *1-3 (D.D.C. May 18, 1981). And the President's exercise of authority here plainly falls within the scope of the statute.

12

national security, "the lack of competence on the part of the courts is marked," and judicial review of those determinations is thus sharply constrained. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (citation omitted).

The President's determination under the statute's second prong—whether the provisions of Chapter 71 "cannot be applied . . . in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B)—is especially ill-suited to judicial second-guessing. When the President adopts "a preventive measure . . . in the context of . . . national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions." *Holder*, 561 U.S. at 35. Determining the "national security requirements and considerations" of the Nation is not a task for which this Court or any other is well-equipped. *See id.* at 34 ("the lack of competence on the part of the courts is marked" (citation omitted)); *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) (refusing to review denial of security clearance because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment . . . [n]or can such a body determine what constitutes an acceptable margin of error in assessing the potential risk"). Rather, the President is entitled to reach a national security-based finding before the national security is jeopardized. As with the exemption's first prong, this Court is ill suited to second guess that determination.

## II.     The Department of Treasury Meets the FSLMRS Statutory Criteria.

In any event, the President's determinations withstand scrutiny. As detailed below, the Department "has as a primary function . . . investigative . . . or national security work[.]" 5 U.S.C. § 7103(b)(1)(A). "Investigative" work means work "characterized by or inclined to investigation," *i.e.*, involving the action of investigating. *See* Oxford English Dictionary (2d ed. 1989) (definitions of "investigative" and "investigation"). The verb "investigate" in turn means "[t]o search or inquire into; to examine (a matter) systematically or in detail; to make an inquiry or examination into." *Id.*

As for "national security work," that phrase has long and consistently been interpreted in the federal labor relations context to refer to work "directly related to protection and preservation of the military, economic, and productive strength of the United States[.]" *Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181*, 4 FLRA 644, 655–56 (1980).

The Department's national security role is clear, primary, and longstanding. Treasury's "mission is to maintain a strong economy and create economic and job opportunities by promoting the conditions that enable economic growth and stability at home and abroad, strengthen national security by combating threats and protecting the integrity of the financial system, and manage the U.S. Government's finances and resources effectively." U.S. Dep't of the Treasury, *Role of the Treasury*, https://home.treasury.gov/about/general-information/role-of-the-treasury. Put simply, Treasury exists to promote the economic and productive strength of the United States—a core national security mission.

The IRS, for which certain of Defendant's members work, falls within the exemption of Treasury, which straightforwardly meets the requirements for exclusion. The IRS also independently meets the criteria for inclusion. The IRS is tasked with collecting almost all Federal revenues. America's military, economic, and productive capacity directly depend on revenue the IRS collects, and IRS tax collections fund almost everything the Federal Government does. *See* IRS, *The agency, its mission and statutory authority*, https://www.irs.gov/about-irs/the-agency-its-mission-and-statutory-authority. History underscores that military readiness through revenue collection is central to the mission of the IRS. After all, it was created in 1862 to collect taxes needed to fund the Civil War. *See* IRS, *Historical Highlights of the IRS*, https://www.irs.gov/newsroom/historical-highlights-of-the-irs. And as NTEU has publicly acknowledged, the IRS has a primary investigative function, as a principal duty is auditing tax filings. *See* Mem. of P.&A. in Supp. of Pl. NTEU's Mot. for Prelim. Inj. at 12, *Nat'l Treas. Emps.*

*Union v. Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 4, 2025), ECF No. 9-1 ("NTEU-represented employees at IRS . . . conduct taxpayer audits[.]").

The President also properly determined that the provisions of Chapter 71 cannot be applied to the Department "consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). As detailed already, the IRS has a significant, critical national security mission. That mission necessarily requires changes in working conditions or employee status to be accomplished without hesitation, advanced notice, or opportunity to bargain with labor organizations. The President's "executive decisions" in the national-security realm require "delicate, complex" assessments and rapid responses from agencies and employees. *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

But CBAs negotiated under the FSLMRS, including those between the parties here, are by nature designed to reduce the control of the agency or subdivision over its personnel and operations. For example, under the FSLMRS, agencies must postpone operational changes that substantively affect working conditions until they have offered the relevant union or unions an opportunity to bargain and have finished any subsequent negotiations, including impasse proceedings when needed. 5 U.S.C. §§ 7106(b), 7119; *see also* Larkins Decl. ¶ 7(d); 2022 National Agreement at 64–66. The FLRA routinely pauses agency attempts to implement changes before this midterm bargaining process has concluded. *See, e.g.*, *Army Corps of Eng'rs,* 53 FLRA 79, 81 (1997). This process often imposes significant delays before operational changes can take effect. For example, the CBAs provide for a month and a half for negotiations with union chapters and factfinding over changes to work procedures that affect only a single geographic area, followed by proceedings before the Federal Service Impasses Panel (FSIP) that typically take four to six months to complete. If IRS has sought FSIP resolution of impasses the CBAs generally prohibit implementing changes until negotiations conclude. *See* 2022 National Agreement at 64–66, 165–

67. The President appropriately determined that requiring lengthy delays before agencies with important national security roles can ordinarily adjust their operations is incompatible with national security considerations.

Employee performance is also critical in agencies with important national security roles. Many provisions in federal agencies' CBAs make it more difficult to remove employees who perform poorly. For example, IRS's CBAs require "performance improvement plans" (PIPs) of "never less than sixty (60) days" before IRS can use the procedures of 5 U.S.C. Chapter 43 to propose removing an employee for poor performance. *See* Larkins Decl. ¶ 7(e); *see also* 5 U.S.C. ch. 43. Even after that process, CBAs allow unions to grieve dismissals of poor performers to binding arbitration, with arbitrators overturning approximately three-fifths of arbitrated removals. *See* James Sherk, America First Policy Inst., *Union Arbitrators Overturn Most Federal Employee Dismissals* 5 (2022). The result: OPM recently found that a plurality of federal employees reported that poor performers in their work units typically "remain in the work unit and continue to underperform," including at most federal agencies, such as the Department. *See* OPM, *2023 Office of Personnel Management Federal Employees Viewpoint Survey: Report by Agency* 49–60, https://www.opm.gov/fevs/reports/data-reports/data-reports/report-by-agency/2023/2023-agency -report.pdf. The Merit Systems Protection Board has also found that only a quarter of Federal supervisors are confident they could remove a subordinate who was underperforming in a critical job element. *See* U.S. Merit Systems Protection Board, *Remedying Unacceptable Employee Performance in the Federal Civil Service* 15 (June 18, 2019), https://www.mspb.gov/studies/ researchbriefs/Remedying_Unacceptable_Employee_Performance_in_the_Federal_Civil_Servic e_1627610.pdf. The President properly determined that CBAs operating under the provisions of 5 U.S.C. Chapter 71 that impede or prevent the Department and other federal agencies from separating underperforming employees are inconsistent with national security considerations.

The IRS CBAs also severely limit the President's ability to ensure the best candidates are hired into and promoted within the agency. The CBAs require giving first consideration to internal candidates before considering external candidates for job vacancies. *See* Larkins Decl. ¶ 7(b). Further, the CBAs impose burdensome procedures on IRS if supervisors wish to depart from automatic candidate rankings for promotions. *See* Larkins Decl. ¶ 7(c). If IRS fails to abide by the negotiated procedures to rank, consider, evaluate, and rate employees, IRS may be required to redo the entire promotion process, thus prohibiting IRS from expeditiously processing personnel actions to respond to mission needs and the Administration's priorities. *Id.* ¶ 7(c). These procedures make it very difficult for IRS to hire and promote the individuals that the President and his appointees consider best equipped to effectively perform IRS's functions.

## III.    A Declaratory Judgment is Appropriate

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  The Act serves an important function by allowing parties to seek legal clarity and resolve concrete disputes without taking actions that would expose them to potential liability (for example, by repudiating a contract, infringing a patent, or violating a statute).  *See generally MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007); *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 288–90 (1995).

Generally, a declaratory judgment is appropriate where it would either "serve a useful purpose in clarifying and settling the legal relations in issue," or "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (citation omitted). In the Sixth Circuit, the legal framework for determining whether to issue a declaratory ruling is derived from the Court

of Appeal's decision in *Grand Trunk Western Railroad Company v. Consolidated Rail Corporation*, and is colloquially known as the "*Grand Trunk*" factors. Those factors include:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Id.* Without indicating how the five factors should be balanced, the Sixth Circuit has emphasized that the weighing of these factors "will depend on the facts of the case." *Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 29 F.4th 792, 801 (6th Cir. 2022) (quotation and citation omitted). Here, all five factors support granting the requested declaratory judgment.

First, an actual controversy has arisen and now exists between the parties concerning the rights and obligations of the Department under the terms of the extant CBAs and MOUs. *See* Compl., ECF No. 1; *see also* Compl., *Nat'l Treas. Emps. Union v. Trump*, No. 1:25-cv-00935 (D.D.C. Mar. 31, 2025), ECF No. 1. Pursuant to those agreements, the Department must use two-month PIPs for underperforming employees before proposing termination or removal and must give priority to internal candidates for vacancies; it also imposes various other pecuniary, logistical, and procedural burdens on operations. *See* Larkins Decl. ¶¶ 7–11. The local MOU between Defendant and the IRS continues to require the IRS to ensure certain features of the office space it provides to employees. *Id.* ¶ 7(f). These requirements are currently restricting the IRS from taking action with regard to personnel and facilities management that it otherwise may deem necessary to meet the changing needs of the Department. *See, e.g.*, *id.* ¶¶ 7(a)–(f).

The Department contends that the President's Executive Order pursuant to 5 U.S.C. § 7103(b) exempts the Department from Chapter 71 of the FSLMRS and thus relieves the Department of its contractual agreement to abide by such terms. That exemption has the legal

effect of voiding the extant CBAs. *See Pioneer Nat. Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4-487*, 338 F.3d 440, 441 (5th Cir. 2003) ("When the NLRB decertified the Union on September 18, 2000, the CBA automatically terminated by operation of law."). And that basis for the invalidity of the CBAs arises under federal law, 5 U.S.C. § 7101 *et seq.*, together with the Executive Order.

But Defendant contends otherwise. Indeed, after the Department filed the instant lawsuit, Defendant's parent organization—NTEU—filed its own lawsuit in the District of Columbia claiming that Executive Order 14,251 is unlawful and seeking declaratory and injunctive relief against the Department and nearly a dozen other federal agencies. Compl., *Nat'l Treas. Emps. Union v. Trump*, No. 1:25-cv-00935 (D.D.C. Mar. 31, 2025), ECF No. 1.

There is accordingly a concrete and immediate dispute over the rights of the parties, leaving IRS with uncertainty regarding its power to terminate the subject CBAs pursuant to the Executive Order. As to the first *Grand Trunk* factor, a declaratory ruling here would settle the controversy because it would resolve the dispute as to the continuing applicability of the Department's CBAs. *See Grand Trunk*, 746 F.2d at 326.

Second, a declaratory judgment here would clarify the legal relations in issue by ratifying that the Department need not continue abiding by the personnel, promotion, unacceptable performance, RIF and other policies imposed by the subject CBAs. *See id.*; *Mass. Bay Ins. Co. v. Christian Funeral Dirs., Inc.*, 759 F. App'x 431, 438 (6th Cir. 2018) ("In general, courts tend to consider this factor with the first factor, reaching the same conclusion for both.").

Third, the Department has not engaged in procedural fencing or a race to res judicata, and therefore the third *Grand Trunk* factor does not weigh against declaratory relief. *See Grand Trunk*, 746 F.2d at 326; *see W. World Ins. Co. v. Hoey*, 773 F.3d 755, 761 (6th Cir. 2014) (noting that the term "procedural fencing" refers to "a range of tactics that courts regard as unfair or unseemly").

If improper motive is not found, this factor is usually weighed as neutral. *Cardinal Health, Inc.*, 29 F.4th at 797. The fact that NTEU filed its own federal lawsuit regarding Executive Order 14,251 against the Department does not indicate that the parties are involved in a race to res judicata. Generally, "one district court decision is not binding on another district court," *Am. Council of the Blind v. Wash. Metro. Area Transit Auth.*, 133 F. Supp. 2d 66, 74 n. 2 (D.D.C. 2001), so filing a case in a given district does not begin a race to res judicata between federal courts. In any event, unlike the Department, NTEU is not an appropriate declaratory judgment plaintiff, as NTEU, which premises its complaint on its belief that it remains subject to the FSLMRS, is required to channel its claims for unfair labor practices (ULPs) through the exclusive review scheme provided by the FSLMRS. *See generally* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. at 12–16, *Nat'l Treas. Emps. Union v. Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 11, 2025), ECF No. 26. The Department, on the other hand, does not have a natural ULP claim against Defendant—and, as it seeks to clarify through this suit, is not subject to Chapter 71 after the President's Executive Order in any event. Through this action it seeks to efficiently "clarify[] and settl[e] the legal relations in issue" and to "afford relief from the uncertainty, insecurity, and controversy giving rise to" likely ULP or other proceedings. *See Grand Trunk*, 746 F.2d at 326. Because the Department did not have improper motives in filing this suit, the third factor should be viewed as neutral. *See Cardinal Health, Inc.*, 29 F.4th at 797.

Fourth, because this case is not brought pursuant to diversity jurisdiction, the fourth factor, which analyzes concerns about comity between the federal and state courts, is inapplicable. *See Grand Trunk*, 746 F.2d at 326.

Fifth, because there is not an "alternative remedy which is better or more effective," the fifth *Grand Trunk* factor supports a declaratory judgment. *Id.* at 326. As previously stated, the FSLMRS and the CBAs do not provide a cause of action for the Department to seek clarification

of its legal right to implement necessary policy changes. Absent the declaratory relief requested, the Department's legal rights could only be adjudicated in a piecemeal fashion by defending against ULP claims brought through the administrative process after the Department has already repudiated contracts. This would result in confusion and unnecessary labor strife, which is particularly problematic in the national security context. Consequently, there is no alternative remedy available to the Department, let alone one that is better or more effective.

Accordingly, based on any weighing of the *Grand Trunk* factors here, the Court should grant this motion and enter judgment in favor of the Department.

## CONCLUSION

For these reasons, the Court should grant the Department's motion for summary judgment.

Dated: April 18, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

 */s/ Emily M. Hall*
EMILY M. HALL (D.C. Bar No. 1780317)
SARAH E. WELCH
Counsel to the Assistant Attorney General
Civil Division, United States Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel: (202) 307-6482
Fax: (202) 514-8071
emily.hall@usdoj.gov

ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Branch Director
LISA ZEIDNER MARCUS
Senior Counsel
Federal Programs Branch

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of April 2025, I electronically filed the foregoing with

the clerk of the court and served on opposing counsel using the CM/ECF system.

 _/s/ Emily M. Hall_____
EMILY M. HALL
Counsel to the Assistant Attorney General
