# Exhibit 1

**Declaration of Allen R. Brooks, Acting Deputy Associate Director for Accountability and Workforce Relations, Office of Personnel Management (April 11, 2025)**

**Ex. 1-A:** Memorandum from Charles Ezell, Acting Director, U.S. Office of Personnel Management to Heads and Acting Heads of Departments and Agencies, regarding Guidance on Executive Order Exclusions from Federal Labor-Management Programs (March 27, 2025)

**Ex. 1-B:** Frequently Asked Questions: Executive Order 14251: "Exclusions from Federal Labor-Management Relations Programs" (April 7, 2025)

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, <br><br> *Plaintiff*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-935-PLF <br><br> Judge Paul L. Friedman |

## DECLARATION OF ALLEN R. BROOKS

Pursuant to 28 U.S.C. § 1746, I, Allen R. Brooks, declare as follows:

1. I am the Acting Deputy Associate Director for Accountability and Workforce Relations at the Office of Personnel Management ("OPM"), and I have served in this role since March 2, 2025. In my current role, I am responsible for leading a team of career human resources specialists that develop governmentwide policy and guidance, draft regulations, and execute certain statutory functions in the areas of labor relations and employee accountability, consistent with direction from the Office of the Director of OPM. I recently joined the OPM on August 25, 2024, as Senior Human Capital Advisor for Labor Relations and Employee Accountability. I have served as a career federal employee since I started in the same office at the OPM in May 2010 before departing for another federal agency in December 2012.

2. I am familiar with the claims in the above-captioned matter regarding a March 27, 2025 Executive Order issued by President Donald J. Trump, Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Based on personal knowledge and information provided to me in the course of my official duties, I provide

this declaration in support of the Defendants' Opposition to the Plaintiff's Motion for a Preliminary Injunction.

3. My office is the point of entry for requests by federal agencies for guidance on further action pursuant to the Executive Order.

4. I have reviewed the Executive Order and corresponding March 27, 2025 guidance issued to federal agencies by OPM entitled "Guidance on Executive Order *Exclusions from Federal Labor Management Relations Program*." A true and correct copy of that document is attached as Exhibit A to this declaration. I have also reviewed a Frequently Asked Questions ("FAQs") document that the Chief Human Capital Officers Council ("CHCOC") released to federal agency chief human capital officers (CHCOs) on April 8, 2025, which addresses federal agency questions concerning implementation of the Executive Order. The CHCOC is an interagency forum where CHCOs can provide and receive input and guidance on Federal HR policy. A true and correct copy of that FAQs document is attached as Exhibit B to this declaration.

5. The CHCOC FAQs document was originally sent to federal agency Chief Human Capital Officers and Deputy Chief Human Capital Officers. On April 8, my office further distributed this document to senior labor and employee relations practitioners within federal agencies. Among the agency recipients of this document were officers or officials of each of the Defendant agencies in the above-caption matter, *i.e.*, the Department of Justice; the Department of the Treasury; the Department of Health and Human Services; the Department of the Interior; the Department of Energy; the Environmental Protection Agency; the Federal Communications Commission; and the Office of Personnel Management.

6. Within the CHCOC FAQs document were the following key points of advice to

federal agencies:

    a. Agencies should not terminate any collective bargaining agreements ("CBAs") until the conclusion of litigation or further guidance from OPM directing such termination.

    b. Agencies should not file any decertification petitions until litigation regarding the Executive Order has been resolved.

    c. Agencies should ask the Federal Labor Relations Authority to hold cases where an arbitrator ordered relief for a bargaining unit covered under the Executive Order in abeyance pending the outcome of litigation, where practicable.

7. Plaintiff National Treasury Employees Union ("NTEU") does not have a CBA with OPM nor does it represent any OPM bargaining unit employees.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 11, 2025.

_____
ALLEN R. BROOKS

# Exhibit 1-A



UNITED STATES OFFICE OF PERSONNEL MANAGEMENT

Washington, DC 20415

The Director

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads and Acting Heads of Departments and Agencies |
| **FROM:** | Charles Ezell, Acting Director, U.S. Office of Personnel Management |
| **DATE**: | March 27, 2025 |
| **RE**: | Guidance on Executive Order *Exclusions from Federal Labor-Management Programs* |

On March 27, 2025, President Trump signed an executive order entitled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). This order invoked the President's authority under 5 U.S.C § 7103(b)(1) and 22 U.S.C. § 4103(b) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute and the Foreign Service Labor-Management Relations Statute (individually and collectively, the FSLMRS).[1] The President's Executive Order directs that the FSLMRS will no longer apply to the following agencies and agency subdivisions (collectively, the "covered agencies and subdivisions"):

- The Department of Defense;

- The Department of State;

- The Department of the Treasury, except the Bureau of Engraving and Printing;

- The Department of Veterans Affairs (VA);

- The Department of Justice, except certain components of the U.S. Marshals Service;

- Subdivisions of the Department of Homeland Security:
  - Departmental Headquarters components;
  - U.S. Citizenship and Immigration Services;
  - Immigration and Customs Enforcement;
  - U.S. Coast Guard;
  - The Cybersecurity and Infrastructure Security Agency; and
  - The Federal Emergency Management Agency;

---

[1] These provisions are codified in chapter 71 of title 5, United States Code, and subchapter X of chapter 52 of title 22, United States Code.

Case: 2:25-cv-00049-DCR   Doc #: 12-1   Filed: 04/18/25   Page: 8 of 17 - Page ID#: 93
Case 1:25-cv-00935-PLF   Document 26-1   Filed 04/11/25   Page 7 of 16

Page 2

- Subdivisions of the Department of Health and Human Services:
    - Office of the Secretary;
    - Office of the General Counsel;
    - Food and Drug Administration;
    - Centers for Disease Control and Prevention;
    - The Administration for Strategic Preparedness and Response;
    - The National Institute for Allergy and Infectious Diseases, National Institutes of Health; and
    - Office of Refugee Resettlement, Administration for Children and Families.

- The Department of Energy, except the Federal Energy Regulatory Commission;

- Subdivisions of the Department of the Interior:
    - Office of the Secretary;
    - Bureau of Land Management;
    - Bureau of Safety and Environmental Enforcement;
    - Bureau of Ocean Energy Management;

- Subdivisions of the Department of Agriculture:
    - The Food Safety and Inspection Service;
    - The Animal and Plant Health Inspection Service;

- The International Trade Administration within the Department of Commerce;

- The Environmental Protection Agency;

- The U.S. Agency for International Development;

- The Nuclear Regulatory Commission;

- The National Science Foundation;

- The International Trade Commission;

- The Federal Communications Commission;

- The General Services Administration; and

- The Office of the Chief Information Officer (CIO) in each Executive department, as well as the CIO offices for the U.S. Office of Personnel Management (OPM) and the Social Security Administration, and any other agency or subdivision that has information

Case: 2:25-cv-00049-DCR   Doc #: 12-1   Filed: 04/18/25   Page: 9 of 17 - Page ID#: 94
Case 1:25-cv-00935-PLF   Document 26-1   Filed 04/11/25   Page 8 of 16

Page 3

resources management duties as the agency or subdivision's primary duty.[2]

By operation of 5 U.S.C. § 7103(b) and *Exclusions*, covered agencies and subdivisions are no longer subject to the collective-bargaining requirements of chapter 71 of part III, subpart F of title 5 (5 U.S.C. §§ 7101-7135). Consequently, those agencies and subdivisions are no longer required to collectively bargain with Federal unions. Also, because the statutory authority underlying the original recognition of the relevant unions no longer applies, unions lose their status as the "exclusive[ly] recogni[zed]" labor organizations for employees of the agencies and agency subdivisions covered by *Exclusions*.[3]

Agencies should consult with their General Counsels as to how to implement the President's directive in *Exclusions*. Agencies should also begin to consider and implement the changes described below and any others that agencies deem necessary, consistent with the President's national security determination. OPM highlights some common provisions of agency CBAs that may be inconsistent with the President's policies and management priorities.

### I. Performance Accountability

Merit system principles codified at 5 U.S.C. § 2301(6) direct agencies to separate employees who cannot or will not improve their performance to meet required standards. This often does not occur. When asked what happens to poor performers in their work unit, a plurality of Federal employees respond that they "remain in the work unit and continue to underperform."[4] Only a quarter of agency supervisors report that they are confident they could remove a seriously underperforming employee.[5]

Strengthening performance accountability in the Federal workforce is a high priority of President Trump and his Administration. The President believes that he must be able to effectively supervise Federal employees to take care that the law is faithfully executed and to protect America's national security. Shortly after taking office the President issued multiple directives to facilitate the separation of underperforming employees.[6]

Agency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation. Covered agencies and subdivisions should seek to bring

---

[2] The Executive Order excludes the immediate employing offices of police and firefighters. It also provides a process for the Secretaries of Defense and Veterans Affairs to retain collective bargaining in subdivisions of their agencies if they certify that doing so does not impair national security.
[3] *Cf.* 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . ."), *id.* § 7114(a)(1) (authorizing the exclusively recognized labor organization to "negotiate collective bargaining agreements covering[] all employees in the unit.")
[4] https://www.opm.gov/fevs/reports/opm-fevs-dashboard/.
[5] U.S. Merit Systems Protection Board, *Remedying Unacceptable Employee Performance in the Federal Civil Service* (June 18, 2019), at p. 15.
[6] *See* Executive Order 14171 of Jan. 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*); Memorandum of January 20, 2025 (*Restoring Accountability for Career Senior Executives*); Executive Order 4211 of Feb. 12, 2025 (*One Voice for America's Foreign Relations*).

Case: 2:25-cv-00049-DCR   Doc #: 12-1   Filed: 04/18/25   Page: 10 of 17 - Page ID#: 95
Case 1:25-cv-00935-PLF   Document 26-1   Filed 04/11/25   Page 9 of 16

Page 4

their policies into alignment with the specific Administration priorities below.

### A. Limit PIPs to 30 Days.

The Civil Service Reform Act (CSRA) requires agencies to provide underperforming employees with an opportunity to demonstrate acceptable performance before dismissing them under chapter 43 of title 5, United States Code.[7] These opportunity periods are commonly known as Performance Improvement Periods (PIPs). Executive Order 13839 of May 25, 2018. (*Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles*) generally standardized PIPs at 30 days. Executive Order 14003 of January 22, 2021 (*Protecting the Federal Workforce*) rescinded Executive Order 13839 and directed agencies to reverse policies effectuated under it. Under this directive, agencies increased PIPs from 30 days to 60 to 120 days. However, Executive Order 14171 of January 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*) revoked Executive Order 14003 and directed agencies to reverse disciplinary and unacceptable-performance policies effectuated pursuant to it.

Prior OPM guidance has explained that Executive Order 14171 now requires agencies to return to the policies of Executive Order 13839.[8] Agencies are accordingly required to, consistent with applicable law, return PIPs to 30 days. Where a CBA requires PIPs of more than 30 days, agencies must generally wait until such CBAs expire or otherwise terminate before shortening PIPs.[9] After covered agencies and subdivisions terminate CBAs that require PIPs of more than 30 days, they should take prompt action to reduce PIPs for former bargaining unit employees to no more than 30 days.

### B. Use Chapters 43 and 75 for Performance-Based Removals.

Covered agencies and subdivisions are required to revert their discipline and unacceptable performance policies to those set in the first Trump Administration under Executive Order 13839. This includes the directive to use the procedures of chapter 75 of title 5, United States Code, in addition to chapter 43 (discussed above), to separate employees for unacceptable performance in appropriate cases.[10]

Chapter 75 actions do not require a PIP but bear a higher burden of proof than chapter 43 actions. Many agency CBAs functionally prohibit using chapter 75 procedures by requiring PIPs for all performance-based separations. Covered agencies and subdivisions that have terminated their CBAs should thereafter use chapter 75 procedures to separate underperforming employees without PIPs in appropriate cases. Agencies may continue to use chapter 43 procedures in appropriate cases.

### C. VA Should Resume Use of Section 714.

---

[7] 5 U.S.C. 4202(c)(6).
[8] OPM, *Guidance on Revocation of Executive Order 14003* (Feb. 7, 2025).
[9] 5 U.S.C. 7116(a)(7).
[10] See section 2(h) of Executive Order 13839.

Page 5

In 38 U.S.C. § 714, Congress gave VA special authority to remove some employees for poor performance without a PIP and with a lower burden of proof than chapter 43 actions. The Biden Administration discontinued use of section 714 authority after an arbitrator held that VA could not renegotiate its CBA to eliminate contractual PIPs. VA should, upon termination of its CBA, consider whether to resume use of section 714 authority in appropriate cases. Where facts and circumstances warrant, VA should cease providing covered employees with PIPs before separating them for poor performance under section 714.

### D.  Discontinue Grievance Participation.

In keeping with the provisions of the FSLMRS, CBAs provide for binding arbitration of union grievances, including disputes over whether personnel actions were justified.[11] To implement *Exclusions*, agencies should cease participating in grievance procedures after terminating their CBAs. To the extent that covered agencies and subdivisions are litigating grievances before an arbitrator when they terminate their CBAs, they should discontinue participation in such proceedings upon termination. Agencies can and should compensate arbitrators for work performed prior to the termination of the CBA, but not for any work performed thereafter. Agencies should not participate in further grievance arbitration proceedings following termination of their CBAs.

## II.   Effective and Efficient Government

It is the policy of the President and his Administration to eliminate waste, bloat, and insularity within agencies and operate them more efficiently. Covered agencies and subdivisions should therefore take the following actions after terminating their CBAs.

### A.  Disregard Contractual RIF Articles.

The President has directed agencies to prepare large-scale reductions in force (RIFs).[12] OPM previously provided guidance about agency collective bargaining obligations when undertaking RIFs.[13] Covered agencies and subdivisions that terminate their CBAs are advised that this guidance will no longer apply. After terminating their CBAs, covered agencies and subdivisions should conduct RIFs consistent with applicable statutory and regulatory requirements, but without regard to provisions in terminated CBAs that go beyond those requirements.

### B.  Return to In-Person Work.

The President considers returning agency employees to in-person work necessary for effective and efficient agency operations. The President issued a memorandum generally requiring

---

[11] 5 U.S.C. § 7121.
[12] OPM, *Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (February 26, 2025).
[13] OPM, *Guidance on Collective Bargaining in Connection with Reductions in Force* (March 12, 2025).

Case: 2:25-cv-00049-DCR   Doc #: 12-1   Filed: 04/18/25   Page: 12 of 17 - Page ID#: 97
Case 1:25-cv-00935-PLF   Document 26-1   Filed 04/11/25   Page 11 of 16

Page 6

in-person work on the first day of his Administration.[14] OPM guidance has explained that substantive telework levels and the substantive determination of which positions are eligible for telework or remote work are non-negotiable management rights.[15] However, agency CBAs sometimes impose procedural restrictions on agency return to work policies that do not violate non-negotiable management rights. Upon termination of these CBAs, covered agencies and subdivisions should swiftly implement the President's directives in *Return to In-Person Work*.

### C. Use Agency Resources for Agency Business.

The FSLMRS permits unions to negotiate to allow agency employees to perform union representational work instead of agency business during their official duty hours.[16] Contractual authorization for "taxpayer-funded union time" terminates when agency CBAs are terminated. Additionally, employees no longer have representational activities to conduct once their agency or subdivision has been excluded from the FSLMRS coverage. *Exclusions* requires agencies to promptly return such employees to performing solely agency business. Upon termination of any CBAs that require taxpayer-funded union time, agencies should reassign employees on union time to duties that solely include agency business.

Many agency CBAs similarly provide Federal unions with free use of agency resources (such as office space) or commit the agency to cover certain union expenses (such as the cost of travel and per diems). Following termination of CBAs that require such subsidies, covered agencies and subdivisions should promptly discontinue them and use agency resources only for agency business.

### D. End Allotments Through Agency Payroll Systems.

The FSLMRS requires agencies to deduct union dues from employees' pay upon request.[17] Agency resources are expended to set up those payroll deductions and process payments, and many agency CBAs contractually commit agencies to making such allotments according to specified procedures. When a covered agency terminates its CBAs, those contractual commitments no longer apply, and the covered agency should terminate allotments except where required by statute. Agency employees may make other arrangements for dues payments if they wish to do so. However, agency resources ordinarily should not be expended to facilitate payment of union dues.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, Human Resources Directors, and Chiefs of Staff

---

[14] Memorandum of January 20, 2025 (*Return to In-Person Work*).
[15] OPM, *Guidance on Collective Bargaining Obligations in Connection with Return to In-Person Work* (February 3, 2025).
[16] 5 U.S.C. 7131(d), 22 U.S.C. 4118(d)(4).
[17] 5 U.S.C. 7115, 22 U.S.C. 4118(a).

# Exhibit 1-B

## Frequently Asked Questions

### Executive Order 14251:
### "Exclusions from Federal Labor-Management Relations Programs"

**Q1:** What do agencies need to do to terminate applicable CBAs?

**A1:** Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination. Agencies should review relevant case law and consult with their General Counsels regarding next steps with any existing CBAs. See *Department of Labor*, 70 FLRA 27 (FLRA 2016).

**Q2:** Should agencies decertify bargaining units of covered agencies or subdivisions?

**A2:** Agencies should not file any decertification petitions until litigation regarding *Exclusions* has been resolved. **Only after the litigation is final and the Administration has assessed the implications of its outcome** should agencies consider filing Federal Labor Relations Authority (FLRA) petitions to clarify that bargaining units include only those positions not exempted from collective-bargaining requirements under *Exclusions*. Agencies should consult their General Counsels for updates on the litigation, and before taking steps to file a decertification petition in compliance with the *Exclusions* order.

**Q3:** Should agencies amend current filings with the FLRA for exceptions to arbitration awards where an arbitrator ordered relief for a bargaining unit covered under *Exclusions*?

**A3:** Agencies should ask the FLRA to hold these cases in abeyance pending the outcome of litigation, where practicable. In cases with pending deadlines for submissions, agencies should ask the FLRA to suspend or extend those deadlines until the conclusion of the litigation. If the FLRA does not suspend deadlines or hold cases in abeyance agencies should take the position that the union lacks standing as it is not recognized as a result of *Exclusions*.

**Q4:** In any ongoing proceedings in which an agency is asked to submit a statement of position regarding an unfair labor practice charge under investigation by the FLRA, should agencies submit a statement?

**A4:** Yes. However, agencies should raise to the appropriate FLRA regional office that the relevant agency or agency subdivision is no longer subject to provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) per the *Exclusions* order and, therefore, the union no longer has standing to file a charge or the FLRA to issue a complaint.

**Q5:** Should agencies and agency subdivisions covered by *Exclusions* continue to participate in the FLRA's Collaboration and Alternative Dispute Resolution Office (CADRO) with labor unions representing police officers, security guards, and firefighters? What about bargaining units comprised of other occupations?

**A5:** Agencies may continue collective bargaining activities, including dispute resolution efforts with CADRO and other third-party proceedings with unions representing police officers, security guards, and firefighters, provided that these unions continue to be recognized consistent with

*Exclusions*. However, for matters involving a dispute for any unit that represents positions now excluded under Executive Order 12171, as amended, agencies should continue those dispute resolution activities only if they are doing so independently of any requirements of a CBA and not relying on any provisions of Chapter 71 to compel their participation.

**Q6:** Should agencies change the bargaining unit status codes on employees' SF-50s?

**A6:** Not at this time. Agencies should wait until litigation is resolved before doing so.

**Q7:** What is meant by the term "subdivision?"

**A7:** The term "subdivision" refers to any organization, office, or component that is subordinate to an agency or department head, as well as any division within those organizations, offices, or components.

**Q8:** What is meant by Section 2 of Executive Order 14251 (*Exclusions*) where it states: "the immediate, local employing offices of any agency police officers, security guards, or firefighters…"

**A8:** This means an agency or subdivision that directly supervises and employs such employees at the local level. Although this category will generally include purely the law enforcement officers in question, in some cases this may also include the administrative staff who support law enforcement operations.

**Q9**: What actions should agencies take regarding bargaining units that represent both (i) employees in positions *not* subject to exclusion (e.g., police officers, security guards, firefighters) and (ii) agency employees now *excluded* under the President's new directive?

**A9:** Agencies should preserve the rights of employees not excluded from collective bargaining including continuing to participate in third-party procedures (e.g., arbitrations) that are focused solely on conditions of employment, contractual and statutory obligations, or other matters limited to these employees. For employees no longer included in a bargaining unit, agencies should follow the direction provided in this guidance. If agencies need further guidance, please contact OPM at awr@opm.gov.

**Q10:** If an employee is no longer permitted to join or form a labor organization under the FSLMRS, can he or she strike against the Government while serving as a federal employee?

**A10:** Under 5 U.S.C. § 7311, employee strikes against the Government of the United States are prohibited for all Federal employees, irrespective of whether they are in a bargaining unit.

**Q11:** Can grievances initially filed under a negotiated grievance process (5 U.S.C. 7121) be transitioned to an administrative grievance process?

**A11:** Yes, provided the matter is not excluded by the agency's administrative grievance procedure and the grievant timely requests a transition to the administrative grievance procedure.

**Q12:** Are unions ineligible as employee representatives under the FSLMRS permitted to establish

consultative relationships with agencies pursuant to 5 C.F.R. Part 251?

**A12:** OPM's regulations "[provide] a framework for consulting and communicating with **non-labor organizations** representing Federal employees and with other organizations on matters related to agency operations and personnel management." A union is a "labor organization," as defined in 5 U.S.C. 7103(a)(4), and is therefore, not covered by 5 C.F.R. Part 251 whether they represent bargaining unit employees at an agency or not.

**Q13:** With announcement of the new Executive Order, *Exclusions*, are covered agencies still required to submit data to OPM regarding taxpayer-funded union time (TFUT), collective bargaining costs, and other labor relations data points?

**A13:** Yes. Please continue to collect and timely submit agency labor relations data as requested, even if the agency or subdivision therein is now exempted from the provisions of the FSLMRS.

**Q14:** What should we do with agreements that are pending Agency Head Review (AHR) and cover newly excluded agencies, subdivisions, or partial groups?

**A14:** Agencies should exercise their agency head authority under 5 U.S.C. § 7114(c) to disapprove any agreement currently undergoing review for units that are no longer recognized within a covered agency or subdivision. Agencies should cite to *Exclusions* or, if applicable, the presidential memorandum *Limiting Lame-Duck Collective Bargaining Agreements That Improperly Attempt to Constrain the New President*, as their basis for disapproval. For agreements that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct AHR as they normally would. Lastly, for agreements that include a mix of excluded and included units, agencies should continue AHR and include a note that the agreement only covers those not excluded by Executive Order 14251 and that the agreement has no applicability to other employees.

**Q15:** For agencies that are currently bargaining with unions, are there any concerns with solidifying and executing agreements such as tentative agreements or memoranda of understandings or agreements (MOUs or MOAs)?

**A15:** Agencies should suspend such negotiations until the conclusion of litigation.

**Q16:** In Section 2 of *Exclusions,* 1-419 states: "The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management: (a) Office of the Chief Information Officer (OCIO); (b) any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty." Does this apply to all OCIO offices within an agency not listed in *Exclusions*?

**A16:** This provision applies only to CIO offices in the Executive Departments (see 5 U.S.C. 101), OPM, and the Social Security Administration, as well as the subordinate agencies and offices under those Departments/agencies.

**Q17**: What does information resources management mean as used in Section 2 of *Exclusions*?

**A17**: The Paperwork Reduction Act defines "information resources management" at 44 U.S.C. § 3502(7), as "the process of managing information resources to accomplish agency missions and to improve agency performance, including through the reduction of information collection burdens on the public."