UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| UNITED STATES DEPARTMENT OF TREASURY, | ) ) ) | Civil Action No. 2: 25-049-DCR |
| Plaintiff, | ) ) | |
| V. | ) ) | |
| NATIONAL TREASURY EMPLOYEES UNION, CHAPTER 73, | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff United States Department of the Treasury ("Treasury") has filed a Complaint seeking a Declaratory Judgment. It asks the Court to hold that it may rescind or repudiate a collective bargaining agreement with Defendant National Treasury Employees Union, Chapter 73 pursuant to President Donald J. Trump's Executive Order, 14,251, *Exclusions from Federal Labor Management Relations Program*. Treasury contends that rescission or repudiation of the agreement would be a valid exercise of the President's authority under 5 U.S.C. § 7103(b)(1). Treasury makes a good argument on the merits. However, it does not have standing to bring the action in this forum under the facts presented. As a result, this action will be dismissed.

## I.  Background

Historically, the president has "regulated labor relations in the federal government and internal matters of unions representing federal government employees" by executive order. *See, e.g.*, *Local 1498, AFGE v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975) (cleaned

up).  "This was a project of the Executive, and not of the Congress."  *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965).  However, in 1978, Congress passed the Federal Service Labor-Management Relations Statute ("FSLMRS"), 5 U.S.C. § 7101 *et seq.*, as part of the Civil Service Reform Act providing that "the statutory protection of the right of [federal] employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest."  5 U.S.C. § 7101(a).  Congress codified that labor organizations contribute "to the effective conduct of public business" and facilitate and encourage "amicable settlements of disputes between employees and their employers involving conditions of employment."  *Id.*

The statute also provides a mechanism for an employee or a union to file a grievance in accordance with the negotiated grievance procedure.  5 U.S.C. § 7121.  A union or employee may file a charge with the Federal Labor Relations Authority[1] ("FLRA").  *See* 5 U.S.C. § 7118(a)(1).  After a hearing regarding whether an unfair labor practice has occurred, the FLRA may order a cease and desist of the unfair labor practice, require parties to renegotiate a collective bargaining agreement, require reinstatement of a terminated employee, or other such action to carry out the chapter's purpose.  5 U.S.C. § 7118(a)(6)–(7).  The FLRA's final orders are appealable to the United States Court of Appeals for the District of Columbia or to any circuit where the aggrieved party resides or transacts business.  5 U.S.C. § 7121(a).

---

[1]  The FLRA is a quasi-judicial body comprised of three full-time members whom the president appoints for fixed five-year terms.  5 U.S.C. § 7104; U.S. FLRA, *The Authority: About Us*, https://www.flra.gov/ components-offices/components/authority.

When Congress enacted the FSLMRS, it exempted certain agencies and provided that:

> The President may issue an order excluding any agency or subdivision thereof from coverage under [the statute] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the statute] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1). Since its inception, every president except President Joseph Biden has used this power to exclude agencies and/or subdivisions. [Record No. 12 at 1] For example, in 1979, President Jimmy Carter excluded more than forty-five agencies or agency subdivisions by executive order. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). That said, no president has exempted entire cabinet-level agencies before now. [Record No. 26 at 3] Prior to leaving office, the Biden Administration renegotiated several collective bargaining agreements to extend into President Donald J. Trump's second term. [Record No. 1 at ¶ 32] (explaining that the 2022 National Agreement is in effect until October 1, 2027).

On March 27, 2025, President Trump issued Executive Order 14,251, *Exclusions from Federal Labor Management Relations Program* ("*Exclusions*")[2] removing roughly a dozen agencies and departments from FSLMRS, including the United States Department of the Treasury ("Treasury"), except for the Bureau of Engraving and Printing. [Record No. 15-1 at 4] *Exclusions* provides that each of the impacted agencies and subdivisions, has as "a primary function intelligence, counterintelligence, investigative, or national security work" and that the FSLMRS cannot be applied to them in a "manner consistent with national security

---

[2] The White House, *Exclusions from Federal Labor Management Relations Program*, Executive Orders, (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/exclusions-from-federal-labormanagement-relations-programs; Exec. Ord. 14,251, 90 Fed. Reg. 14,553 (Apr. 3, 2025)).

requirements and considerations." Exec. Ord. 14,251, 90 Fed. Reg. 14,553 (Apr. 3, 2025). Earlier that same day, the Office of Personnel Management ("OPM") issued guidance[3] for implementing *Exclusions* including that those covered "are no longer required to collectively bargain with Federal unions." [Record Nos. 12 at 5 and 15-1 at 5] The OPM guidance also directed agencies to submit a report to the President of outlining other agencies and subdivisions that should likewise be excluded under § 7103(b)(1) within thirty days. [Record No. 15-5] And on the same day *Exclusions* was released, the Administration also released a related Fact Sheet addressing, in part, its rationale for the Executive Order.[4] [Record No. 22-4]

The following day, Treasury filed this Complaint for Declaratory Relief seeking a declaration that it has the power to terminate its national collective bargaining agreement and other supplemental agreements (collectively "CBAs") with Defendant National Treasury Employees Union, Chapter 73 ("Chapter 73") pursuant to *Exclusions* because it is a valid exercise of the President's authority under the exclusion provision in FSLMRS, 5 U.S.C. § 7103(b)(1). [*See* Record No. 1 at ¶¶ 9, 12, 63.] More specifically, the action "seeks a declaration limited to Chapter 73 'as to all of the agreements that are named in' the Complaint." [Record Nos. 24 at 74–76 and 31 at 13] The CBAs at issue include the Internal Revenue

---

[3] U.S. Office of Personnel Management, *Memorandum*, (Mar. 27, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf.

[4] The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements*, (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.

Service ("IRS") and National Treasury Employees Union's ("NTEU") 2022 National Agreement and the 2025 Addendum to the National Agreement, both of which apply to IRS employees nationwide. [Record No. 1 at ¶ 44] Additionally, there are local agreements and memorandums of understanding executed between Chapter 73 and the IRS. *Id.* at ¶ 29.

Chapter 73 is headquartered in Covington, Kentucky, and represents over two thousand IRS employees in this district. [Record No. 12 at 2] In 2024, thirty Chapter 73 union stewards expended over 15,000 hours of official time for union activities. *Id.* at 7–8. And there are presently over thirty open grievances filed by Chapter 73 against Treasury for actions taken to manage its workforce. *Id.*

In addition to this civil matter,[5] the remaining agencies and subdivisions[6] removed from the FSLMRS by *Exclusions*, filed a lawsuit in the United States District Court for the Western District of Texas seeking declaratory relief that they also may terminate their respective CBAs with the American Federation of Government Employees local chapters. *United States Department of Defense, et al. v. American Federation of Government Employees, AFL-CIO, District 10, et al.*, No. 6:25-cv-119 (W.D. Tex. Mar. 27, 2025)[7]. That lawsuit was filed on the

---

[5] While the government did not seek a declaratory judgment regarding the foreign service employees affected by *Exclusions* under the Foreign Service Labor-Management Relations Statute, 22 U.S.C. 4103(b), the American Foreign Service Association union, filed suit against the government seeking a preliminary injunction. *American Foreign Service Association v Trump, et al.*, No. 1:25-cv-1030 (D.D.C. Apr. 7, 2025).

[6] The plaintiffs include: the Department of Defense (DOD), the Department of Agriculture (USDA), the Environmental Protection Agency (EPA), the Department of Homeland Security (DHS), the Department of Housing and Urban Development (HUD), the Department of Justice (DOJ), the Social Security Administration (SSA), and the Department of Veterans Affairs (VA).

[7] Much like NTEU's preliminary injunction lawsuit filed days after *Exclusions*, *i.e.*, the D.C. case, AFGE along with several other impacted unions filed suit in *American Federation of*

same day as *Exclusions* but before it was released to the public.  *See id.*  United States District Judge Alan D. Albright set a hearing on the pending motions for June 6, 2025.  *Id.*

On the heels of union lawsuits challenging *Exclusions*, the Chief Human Capital Officers Council (an interagency forum led by the OPM Director) circulated a Frequently Asked Questions document ("FAQs") addressing agency inquiries concerning the implementation of *Exclusions*.  [Record No. 12 at 6] The FAQs made clear that agencies should wait until litigation is concluded before terminating collective bargaining agreements or filing decertification petitions.  [Record No. 12-1 at 18] But by that time (April 8, 2025), all automatic withdrawals from federal employees' paychecks for union dues had ceased and all agency office space and official duty hours for union activities was terminated.  [Record No. 24 at 77–78]

On April 2, 2025, this Court set a hearing on Treasury's Complaint for Declaratory Relief for April 25, 2025.  Before the hearing, Treasury filed a motion for summary judgment on the merits; Chapter 73 moved to dismiss under Rules 12(b)(7) and 12(b)(3) of the Federal Rules of Civil Procedure for improper venue or alternatively, to transfer the case to the United States District Court for the District of Columbia and failure to join an indispensable party (Chapter 73's parent union NTEU) respectively; and Chapter 73 tendered a motion for summary judgment for lack of subject matter jurisdiction or alternatively, dismissal for an inappropriate request for declaratory relief.  [Record Nos. 12, 15, and 22] During oral argument, the parties addressed the merits, venue, indispensable party, and issues of subject

---

*Government Employees, AFL-CIO, et al. v. Trump et al.*, No. 3: 25-cv-03070 (N.D. Cal. Apr. 3, 2025) making similar arguments.

matter jurisdiction.  [Record No. 24]   Following the hearing, the motions were fully briefed by the parties.

A few days after Treasury filed this action, NTEU filed suit against the Trump Administration seeking declaratory and injunctive relief regarding the implementation of *Exclusions*.  *Nat'l Treasury Emps. Union v. Trump, et al.*, No. 1: 25-cv-00935 (D.D.C. Mar. 31, 2025).  A hearing was set for April 23, 2025, on NTEU's motion for a preliminary injunction, and United States District Judge Paul L. Friedman granted that motion two days later.  *Id.*  In compliance with that order, paycheck deductions for union dues and agency space and official time for union activities have been reinstated.  [Record No. 27 at 6]  Treasury filed a notice to appeal that order to the United States Court of Appeals for the District of Columbia Circuit which remains pending.

## II.  Legal Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" if the underlying substantive law identifies the fact as critical.  *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 247 (1986).  To be sure, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.  In resolving a motion for summary judgment, the court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

### III.  Analysis

The parties disagree regarding the Court's subject matter jurisdiction to grant declaratory relief.  More specifically, they dispute whether a case or controversy existed at the time the Complaint was filed.  Treasury contends that there has been -- and continued to be after the release of *Exclusions* -- an actual controversy between Chapter 73's enforcement of the CBAs and Treasury's implementation of the President's initiatives. [Record No. 27 at 19] Conversely, Chapter 73 insists that no controversy existed at the time the action was initiated because *Exclusions* had not yet been enforced and any conflict between the parties in abiding by the existing contracts cannot amount to an Article III case or controversy (or injury).  [Record Nos. 22 at 9–13 and 30 at 2–3]  Treasury indicates that *Exclusions* was partially enforced, which created an Article III case or controversy.  [Record No. 27 at 5, 12]  And, of course, Chapter 73 disagrees.  It insists that *Exclusions* had not been enforced when the Complaint was filed and that it is not an independent legal entity that can be sued.  [Record No. 22 at 3]  In response, Treasury notes that Chapter 73 participates in formal arbitration, files taxes in its own name, and has assets apart from its parent NTEU similar to other legal entities.  [Record No 27 at 14]

The parties also disagree regarding whether Treasury experienced any cognizable actual or threatened injury.  Treasury alleges that the CBAs constrain its ability to hire and manage employees by delegating vital decision-making to grievance arbitrators, which impinges upon the President's responsibility and efforts to protect the United States; the CBAs impose demanding burdens on Treasury that ultimately undermine the President's ability to oversee the Executive Branch and promote national security; the CBAs allow hostile unions to freeze the status quo for protracted periods of time, which undermines national security

because it limits the President's authority to supervise his agents; and the CBAs bind Treasury until they expire or are renegotiated and take precedence over conflicting agency orders. [Record No. 1 at ¶¶ 2, 29–31, 36–37, 58] Chapter 73 insists that such obligations cannot amount to a cognizable injury because they are based on the existing contracts and are not sufficiently coercive.  [Record No. 30 at 2]

Treasury further contends that it faces a threatened injury if it repudiates the CBAs and terminates Chapter 73 employees, who may then file grievances, which could result in the FLRA or Circuit Court ordering reinstatement, backpay, and attorneys' fees.  [Record No. 27 at 6]  But Chapter 73 argues that such an injury is just too speculative.  [Record No. 30 at 3–4]

Both sides dispute the causal connection and redressability requirements for standing. Treasury provides that, because Chapter 73 is tasked with enforcing the CBAs in this district, if Treasury receives the requested relief (*i.e.*, a declaration that it has the power to repudiate the CBAs as to Chapter 73), then its actual and threatened injury would be no more, and it would be free to implement the President's initiatives.  [Record No. 27 at 8, 11]  Chapter 73 insists that NTEU is the true defendant here, not Chapter 73, because it has no authority to file a grievance without NTEU's consent, NTEU is the exclusive bargaining representative, and Chapter 73 acts only under delegated authority.  [*See* Record No. 22 at 2–3.]  Therefore, any relief provided to Treasury as it pertains to Chapter 73 would fail to redress its alleged injury because it would not bind NTEU.  *Id.*  at 15.  Further, because IRS employees have other relief avenues apart from the CBAs, even with a declaratory judgment, the risk of backpay would not be redressed.  [Record No. 30 at 4]

- 9 -

### a.  Subject Matter Jurisdiction - Cases and Controversies

Article III of the United States Constitution limits federal courts' subject matter jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  More specifically, federal courts are authorized "to deliver judgments on real disputes, not hypothetical ones, to resolve concrete disputes, not to pronounce judgments on theoretical disputes that may or may not materialize and, if they do, may appear in a variety of forms."  *Saginaw Cnty., Michigan v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–03 (1998)).  The case and controversy limitation prevents federal courts from issuing advisory opinions.  *Saginaw Cnty.*, 946 F.3d at 954; *Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232 (6th Cir. 1985) ("The requirements of standing, ripeness, and mootness guard against the issuing of advisory opinions.").

"The requirements of Art. III are not satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process."  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982).  Instead, the case and controversy requirement insists that there be a "'real, earnest, and vital controversy'" between the parties.  *Id.* (quoting *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345 (1892)).  "The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them."  *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952).  "The difference between an abstract question and a controversy suitable for judgment is largely a one of degree."  *Safety Specialty Ins. Co. v. Genesee Cnty.*

*Bd. of Commissioners*, 53 F.4th 1014, 1021 (6th Cir. 2022) (citing *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

"'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 407 (2013) (quoting *Raines v. Byrd,* 521 U.S. 811, 818 (1997)). "Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 407. Resting on these principles, in 1793 the Supreme Court refused to provide George Washington the legal opinion he requested, noting "federal courts do not issue advisory opinions about the law—even when requested by the President." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378–79 (2024) (citing 13 Papers of George Washington: Presidential Series 392 (C. Patrick ed. 2007)).

The "judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian Coll.*, 454 U.S. at 471; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021) ("Federal courts do not possess a roving commission to publicly opine on every legal question [and] do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities."). While federal courts sometimes are called upon to exercise that authority, "when employed unwisely or unnecessarily it is also the ultimate threat to the continued effectiveness of the federal courts in performing that role." *Valley Forge Christian Coll.*, 454 U.S. at 473. As such, courts' "standing inquiry has been especially rigorous" when asked to determine whether an action taken by the executive or legislative    branch

- 11 -

constitutional.  *White v. United States*, 601 F.3d 545, 555 (6th Cir. 2010) (citing *Raines*, 521 U.S. at 820).

The Declaratory Judgment Act provides federal courts with authority to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  The Act, however, does not alter the "essential requisites for the exercise of judicial power" nor does it "otherwise enable federal courts to deliver an expression of opinion about the validity of laws."  *Saginaw Cnty.*, 946 F.3d at 954 (quotations and citations omitted); *Safety Specialty Ins. Co.*, 53 F.4th at 1020.  "All it does is create an alternative remedy—a declaratory judgment—for *existing* cases or controversies[.]"  *Saginaw Cnty.*, 946 F.3d at 954 (emphasis in original).  Therefore, a party seeking declaratory relief, "must satisfy the prerequisites of the Declaratory Judgment Act and Article III's standing baseline."  *Id.*; *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (explaining that declaratory relief is proper when "'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant' relief" (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

**Standing Generally**

Three threshold requirements must be shown for a plaintiff to have standing: (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood that "the injury will be 'redressed by a favorable decision.'"  *Carman v. Yellen*, 112 F.4th 386, 399 (6th Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Standing has a temporal component and must "be determined as of the time the complaint is filed."  *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 849 (6th Cir. 2024) (citations and quotations omitted) ("[O]ur equitable discretion to take judicial notice or

to expand the record, does not permit the use of post-complaint events to retroactively generate standing.").  This rule has no exceptions; and therefore, "'if a plaintiff lacks standing at the time the action commences,'" then that plaintiff is not entitled "'to a federal judicial forum.'" *Id* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000)).

The requirement that a claim must be ripe and not moot also bears on the temporal element of standing.  While ripeness also includes prudential considerations, the "constitutional elements of ripeness encompass traditional parts of the standing inquiry: namely, whether a plaintiff 'is threatened with "imminent" injury in fact.'"  *Carman*, 112 F.4th at 400 (quoting *MedImmune, Inc.*, 549 U.S. at 128 n.8 (quoting *Lujan*, 504 U.S. at 560))).  "Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review."  *Safety Specialty Ins. Co.*, 53 F.4th at 1020 (citing *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997)).  Therefore, if a "case is 'dependent on "contingent future events that may not occur as anticipated, or indeed may not occur at all,"' it is not constitutionally ripe."  *Carman*, 112 F.4th at, 400 (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)))).

"'The party invoking federal jurisdiction' must establish these elements commensurate with the burden of proof required at each stage of a litigation."  *Carman*, 112 F.4th at 399 (quoting *Lujan*, 504 U.S. at 561).  For example, the burden at the pleading stage only requires a plaintiff to "plausibly assert standing."  *Christian Healthcare Centers, Inc.*, 117 F.4th at 842 (citing *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021)).  Whereas "at the summary judgment stage, such a party can no longer rest on . . . mere

allegations, but must set forth by affidavit or other evidence specific facts" to show standing. *Clapper*, 568 U.S. at 412 (citations and quotations omitted).

When a defendant mounts a facial challenge to subject matter jurisdiction based on a lack of standing, the court treats "the allegations in those pleadings as true." *Christian Healthcare Centers, Inc.*, 117 F.4th at 842 (citing *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543–44). However, under a "factual attack" to subject matter jurisdiction, no presumption of truth applies to the factual allegations contained in the pleadings. *See Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). "When facts presented to the district court give rise to a factual controversy, the district court must then weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." *Id.*

The dearth of "specific facts" in Treasury's response to Chapter 73's Motion for Summary Judgment could be explained by its application of the "plausible" standard necessary to survive a *motion to dismiss* for standing. [Record No. 27 at 6] (quoting *Christian Healthcare Centers, Inc.*, 117 F.4th at 842 ("Standing is plausible in a pre-enforcement challenge when the plaintiff pleads 'when, to whom, where, or under what circumstances' its injury will occur.")). The panel in *Christian Healthcare* was reviewing the district court's ruling on a *motion to dismiss*, which is why it applied the plausibility standard. *Christian Healthcare Centers, Inc.*, 117 F.4th at 854 (explaining that a more developed factual record could call into question standing, but "at this pleading stage, it is plausible that a [third-party] complaint would lead to a cognizable injury"). But Treasury must do more than plausibly allege standing at this juncture.

Chapter 73 raises a factual attack regarding Treasury's standing to bring this action. More specifically, it alleges that no case or controversy existed at the filing of the Complaint because no enforcement actions were taken against Chapter 73. [Record No. 22 at 12] Chapter 73 explains that less than twenty-four hours elapsed between the release of *Exclusions* and the Complaint's filing. *Id.* Moreover, the Complaint is devoid of any allegation that Treasury attempted to enforce *Exclusions*. *Id.* Therefore, Chapter 73 insists that Treasury seeks an impermissible advisory opinion requesting that the Court bless its future enforcement action. [Record Nos. 22 at 12 and 30 at 5]

Chapter 73 correctly notes that Treasury's Complaint fails to allege that it enforced *Exclusions* against Chapter 73 or NTEU. Instead, the Complaint provides the actions Treasury *wishes* to take pursuant to *Exclusions*. [*See* Record No. 1 at ¶ 10.] ("Plaintiff wishes to rescind or repudiate those agreements[.]"). The Complaint references the OPM guidance (issued the same day as *Exclusions*) "encouraging the agencies and subdivisions covered by the Executive Order to take appropriate steps toward terminating their previously negotiated CBAs" but does not state that any steps had been taken or that such terminations had occurred prior to the filing of the Complaint. *Id.*

Treasury implied during oral argument and in its filings that enforcement had commenced, but it never specified against whom or when. Indeed, Treasury points to no "specific facts" by affidavit or otherwise that those actions had commenced by the Complaint's filing. *Clapper*, 568 U.S. at 412. As background, the OPM guidance regarding next steps to be taken lists "common provisions of agency CBAs that may be inconsistent with the President's policies and management priorities" including allowing agency official time and space to be used for union activities and automatic payroll deductions for union dues. [Record

No. 12 at 3]  During oral argument on April 25, 2025 (nearly a month after the Complaint's filing), counsel for Treasury indicated in the affirmative that union payroll deductions and agency space for union activities had ceased;[8] however, counsel never claimed that these events occurred *prior* to the filing of the Complaint, despite Chapter 73 raising the issue.  [*See* Record No. 24 at 59–60, 77–78.]  The same is true in Treasury's response to Chapter 73's Motion for Summary Judgment.  [Record No. 27 at 5–6]  Again, it alluded that enforcement had already occurred but has not provided a declaration or affidavit nor pointed to any specific fact indicating that it had enforced *Exclusions* against Chapter 73 *at the time* the Complaint was filed.  *Clapper*, 568 U.S. at 412; *Christian Healthcare Centers, Inc.*, 117 F.4th at 849.

Construing the facts and all reasonable inferences in its favor, Treasury has not provided "persuasive evidence" that *Exclusions* was enforced against Chapter 73 when the Complaint was filed.  *Ohio Nat. Life Ins. Co.*, 922 F.2d at 324.  Further, requiring Chapter 73 to provide more beyond asserting that no enforcement actions had commenced would put it in the difficult position of "disprov[ing] a negative."  *Id* at 327.  And any arguments Treasury advances regarding a pre-existing case or controversy caused by the CBAs' strictures impeding its ability to implement *Exclusions* or other Administration initiatives are foreclosed by *MedImmune* as discussed below.  [*See* Record No. 27 at 5, 8.]

### (2)  Injury in Fact

### Concrete and Particularized

---

[8]  Treasury has since ceased implementing *Exclusion* pursuant to a preliminary injunction issued by the United States District Court for the District of Columbia in *NTEU v. Trump*, No. 25-cv-935, docket entry 32 (D.D.C. Apr. 25, 2025).

"'First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Carman*, 112 F.4th at 399 (quoting *Lujan*, 504 U.S. at 560); *Sullivan v. Benningfield*, 920 F.3d 401, 407–08 (6th Cir. 2019). Concrete injuries are those that are "real and not abstract." *All. for Hippocratic Med.*, 602 U.S. at 381 (citing *TransUnion LLC*, 594 U.S. at 424). But not just any harm will do. Rather, "[c]entral to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms." *TransUnion LLC*, 594 U.S. at 417 (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 340–341 (2016)). While "that inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury," it "does not require an exact duplicate." *TransUnion LLC*, 594 U.S. at 424. Even so, it "is not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *Id* at 424–25. "The injury also must be particularized," meaning that it "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *All. for Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan*, 504 U.S. at 560).

Treasury suggests that its concrete injuries are those that stem from the CBA's constraints. [Record No. 27 at 5–6] But Chapter 73 contends that Treasury seeks an advisory opinion because it asks the Court to declare that the actions it wishes to take are lawful. [Record No. 22 at 11] While Treasury does not address this issue directly, it suggests that its injury is particularized because a declaration in its favor would affect its future behavior

toward Chapter 73.  [*See* Record No. 27 at 27.]  According to Chapter 73, however, Treasury

fails to point to any particular action it has taken against it.  [Record No. 22 at 13–14]

### Actual or Imminent – Not Hypothetical or Conjecture

In the absence of actual injury, "threatened injury" can satisfy the imminence

requirement if it is "'certainly impending,' or there is a 'substantial risk'" that the harm will

occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568

U.S. at 409, 414 n.5).  The "imminent injury" requirement means a plaintiff "cannot sue simply

to avoid a "'*possible* future injury.'"  *Saginaw Cnty.*, 946 F.3d at 954–55 (emphasis in original)

(quoting *Clapper*, 568 U.S. at 409); *see also Safety Specialty Ins. Co.*, 53 F.4th at 1020.

Further, a plaintiff "may not bootstrap standing by 'inflicting harm on' [his or herself] 'based

on [his or her] fears of hypothetical future harm.'"  *Saginaw Cnty.*, 946 F.3d at 955 (quoting

*Clapper*, 568 U.S. at 416).  In summary, a "plaintiff must point to some harm the defendant

has inflicted or is about to inflict on him, and that is susceptible to judicial remedy through an

award of damages or equitable relief."  *Celebrezze*, 766 F.2d at 232.

Treasury cites to *White v. United States* for the proposition that a sufficient injury may

be demonstrated "by establishing actual present harm or a *significant possibility* of future

harm, even though the injury-in-fact has not yet been completed."  (Emphasis added); [Record

No. 27 at 4] (citing *White*, 601 F.3d at 555).  But three years after *White*, the Supreme Court

decided *Clapper*, which called into question the continuing validity of showing only "a

*significant possibility* of future harm" for a threatened injury.  In *Clapper*, the Court struck

down the Second Circuit's "*objectively reasonable likelihood*" of harm standard noting its

inconsistency with the Court's "requirement that 'threatened injury must be certainly

impending to constitute injury in fact.'"  (Emphasis added); *Clapper*, 568 U.S. at 410.  In a

- 18 -

footnote, however, the Court acknowledged that it had found standing in some instances where the plaintiff showed a "'*substantial risk*' that the harm [would] occur." (Emphasis added); *id.* at 414 n.5 (citation omitted). One year after *Clapper*, in *Susan B. Anthony List v. Driehaus*, the Court articulated both standards determining that a threatened injury could be shown if it was "'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (citation omitted). In 2020, the Sixth Circuit, seeming to recognize this narrowing of the imminence requirement, noted that a plaintiff may not sue for declaratory relief merely to avoid a "*possible* future injury." *Saginaw Cnty.*, 946 F.3d at 954–55 (emphasis in original) (quoting *Clapper*, 568 U.S. at 409).

While a "significant possibility" denotes a higher showing than an "objectively reasonable likelihood," it requires a lower showing than "substantial risk." Further, *Clapper* and *Saginaw County* appear to foreclose the "significant *possibility* of future harm" standard articulated in *White*. (Emphasis added). But in this instance, the issue does not turn on which standard applies because Treasury has failed to show a sufficient harm or injury for Article III standing.

Treasury argues that it experienced actual harm by Chapter 73 enforcing the CBAs in the past, present, and possible future enforcement despite the President's lawful exercise in *Exclusions*. [Record No. 27 at 6–8] Further, it contends that it may be subject to significant backpay if it terminates employees but is later ordered to reinstate them. *Id.* at 6. Chapter 73 denies that this constitutes imminent or threatened injury because it is too speculative, and the injuries Treasury claims are not sufficiently coercive. [Record No. 30 at 2–4]

**Analogous Cases**

Rather than address the parties' arguments for Article III standing one-by-one, the undersigned will compare those arguments against ones raised in analogous cases. Because the "difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree," it "would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Maryland Cas. Co.*, 312 U.S. at 273. Therefore, comparing previous cases to the dispute currently before the Court remains useful in determining constitutional standing and "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–42 (1997)).

Start with *Saginaw County, Michigan v. STAT Emergency Medical Services, Inc.*, 946 F.3d 951 (6th Cir. 2020). There, the Sixth Circuit faced an issue like the one presented in this case. Saginaw County had an ordinance allowing only one ambulance service to operate at a time within the County. *Id.* at 953. Since 2009, the County maintained a service contract with Mobile Medical Response. *Id.* But in 2011, despite the ordinance, STAT Emergency Medical Services ("STAT") proceeded to also offer its services within the County in a particular township. *Id.* Then in 2013, STAT threatened to sue if the contract with Mobile Medical Response was renewed by the County and alleged that the ordinance violated "state law, federal antitrust law, and the Fourteenth Amendment." *Id.* The contract was renewed, and three years later, the County codified the exclusivity arrangement by ordinance. *Id.*

- 20 -

STAT sought to expand its services beyond the township, but the County continued to insist that only the Board of Commissioners had the authority to permit that expansion. *Id.* at 954. STAT continued to maintain that Michigan law authorized it to serve more areas in the County. *Id.* But before the County ever enforced its ordinance against STAT (to prevent its operation in that one township), it sought a "declaratory judgment that Michigan law authorizes its exclusive contract with Mobile Medical and that the County does not violate federal antitrust laws or the U.S. Constitution by prohibiting STAT from operating in the county." *Id.* Never reaching the merits, the district court determined that "the County failed to establish an actual or imminent injury and dismissed the case for lack of jurisdiction." *Id.* And the Sixth Circuit affirmed.

Because the case was dismissed at the pleading stage, the County needed only to "plausibly allege facts that, 'under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *MedImmune, Inc.*, 549 U.S. at 127). To determine whether the County had met that burden, the panel assessed standing three different ways, two of which are relevant here:[9] (1) the County as a private entity, asserting a private right; and (2) the County as a public body, asserting public rights. In denying standing under either scenario, the panel made clear that "[e]ach one asks us to do something we cannot." *Saginaw Cnty.*, 946 F.3d at 954.

**Private Rights:** The "first way" looked at the County as any other private party asserting contract or property rights. *See id.* at 954, 956. While STAT had threatened to take

---

[9]   The third way addressed the applicability of arising under jurisdiction limitations to the County that already applied to states. *Saginaw Cnty.*, 946 F.3d at 959–60.

legal action six years prior, it had not done so. *Id.* at 954. Distinguishing that scenario from the one presented in *MedImmune*, the panel noted the difference in the harms alleged. *Id.* at 955.

In *MedImmune*, a patent licensee paid royalties under protest believing that the subject patent was invalid. *Id.* The *MedImmune* Court determined that the penalties faced for breaching the contract were sufficiently coercive. *See id.* (citing *MedImmune, Inc.*, 549 U.S. at 137). There, the "licensee faced a choice between paying the licensing fees now or potentially paying treble damages," attorney's fees, and being enjoined from selling a product that represented roughly 80 percent of its total revenue later. *Saginaw Cnty.*, 946 F.3d at 955; *MedImmune, Inc.*, 549 U.S. at 122. Finding sufficient "harm in the form of immediate or threatened economic loss, the Court held that Article III, "does not require the plaintiff to 'bet the farm' to obtain relief." *Saginaw Cnty.*, 946 F.3d at 955 (quoting *MedImmune, Inc.*, 549 U.S. at 128–29).

But for the County, it was not at risk of paying damages from a Sherman Antitrust Act claim, and the Local Antitrust act barred STAT from recovering damages, interest thereof, or attorney's fees. *Saginaw Cnty.*, 946 F.3d at 955. Further distinguishing the County from the declaratory plaintiff in *MedImmune*, the panel noted that "Saginaw County sits in the driver's seat. It can either enforce the law (which may lead to federal or state-law defenses against the County) or not (which leads to no injury to the County)." *Id.* While the County had prevented STAT from amassing more townships by insisting upon the Board's approval, it never enforced the ordinance to terminate STAT's contract with the township it serviced. Additionally, unlike the *MedImmune* claimant whose injury stemmed "from a breach of contract that concretely defined the scope of the dispute," the County could not determine

which of its conduct STAT's claims would reach because the ordinance had not been enforced. *Id.*

In another attempt to establish harm, the County argued that its contract with Mobile Medical Services required the County to indemnify it against any claims challenging the exclusivity provision. In finding no impending injury, the panel noted that "the County may not bootstrap standing by 'inflicting harm on' itself—adding an indemnity clause—'based on [its] fears of hypothetical future harm.'" (Addition in original); *id.* (quoting *Clapper*, 568 U.S. at 416).

Applying the analysis in *Saginaw County* here compels a similar result. As an initial matter, the undersigned acknowledges the differing stages of litigation in both cases. In *Saginaw County*, because the standing issue was resolved on a motion to dismiss, the plaintiff only needed to "*plausibly* allege facts . . . to warrant the issuance of a declaratory judgment.'" (Emphasis added); *Saginaw Cnty.*, 946 F.3d at 954. In the present case, the issue of justiciability was raised by Chapter 73 in its Motion for Summary Judgment. [Record No. 22] Therefore, to survive summary judgment, Treasury "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence *specific facts*" to show a justiciable controversy. (Emphasis added); *Clapper*, 568 U.S. at 412. Stated another way, "[s]tanding is not 'an ingenious academic exercise in the conceivable,' but as we have said requires, at the summary judgment stage, a factual showing of perceptible harm." *Lujan*, 504 U.S. at 566 (internal citation omitted).

Much like Saginaw County, Treasury believes it has a valid law (*Exclusions*) that authorizes it to terminate its contracts (the CBAs) with Chapter 73. While it implied that it partially implemented *Exclusions* in the less than 24 hours between the Executive Order and

the filing of this action, it sought to do more. Saginaw County also partially implemented its new ordinance when it insisted that STAT seek Board approval before servicing additional townships, but it too wanted to do more (terminate the contract between STAT and that township). And so, it sought declaratory relief that the termination would not violate the law, much like Treasury seeks in this case. Ultimately, the district court and Sixth Circuit panel agreed that the County failed to establish an actual or imminent injury.

The Sixth Circuit reasoned that the impending injury in *MedImmune* was inapposite to the one the County faced. In *MedImmune*, the penalties for breaching the contract were sufficiently severe (treble damages and loss of 80% of its revenue), whereas the County's were not. Relevant to this analysis was that the County could not incur damages or attorney's fees under the law. In the present case, Treasury indicates that it may be subject to reinstatement of employees, backpay, and attorneys' fee awards. But none of those compare to what the claimant in *MedImmune* faced, and they are inherently remedial, not punitive.

Further, the arguable "penalties" Treasury alleges that it faces are not coercive, self-inflicted, and too speculative. Treasury's feared future injuries are loss of taxpayer funds in backpay,[10] IRS manhours, and attorneys' fees if terminated employees are subsequently reinstated. [Record No. 27 at 6, 9] ("The Department should not have to make the difficult choice of acting at its (and American taxpayers') peril in order to clarify its rights under the law."); *see also* [Record No. 24 at 77] (arguing that Treasury could incur "a huge bill on behalf of the American taxpayer for back pay for employees who it tried to terminate and did not get

---

[10]  It is a strain to conceptualize a hypothetical award of backpay as coercive, an injury, or harm because it is inherently remedial in nature, not punitive. Rather, the backpay constitutes what Treasury would have had to pay regardless (of its decision to terminate employees), which hardly can be construed as "harm."

any work out of for the money that it would then have to expend"). Although Treasury may face grievances, lawsuits, delay, or "labor strife" if it fully enforces *Exclusions*, none of those rise to the level of coercion in *MedImmune*. There, the Court made clear that coercion for breaching the contract must be sufficiently severe to qualify as a case or controversy for Article III purposes. *MedImmune, Inc.*, 549 U.S. at 129–30 (outlining examples such as criminal prosecution, forfeiting one's farm, treble damages, etc.).

While extant CBAs inherently create impediments to swift reductions in force, Treasury may not generate standing by inflicting harm upon itself by terminating employees and risking losing the value of those employees' work if it is made to reinstate and backpay them. [Record No. 24 at 76–77] As the panel reasoned in *Saginaw County*, regarding the County's indemnity provision in its contract with the exclusive ambulance service, a declaratory plaintiff "may not bootstrap standing by 'inflicting harm on' [his or herself] 'based on [his or her] fears of hypothetical future harm.'" *Saginaw Cnty.*, 946 F.3d at 955 (quoting *Clapper*, 568 U.S. at 416).

Additionally, these "penalties" cannot amount to threatened injuries because they are more akin to generalized grievances which lack the requisite particularity Article III demands. *All. for Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan*, 504 U.S. at 560). Generalized grievances, such as those incurred by taxpayers, are "inconsistent with 'the framework of Article III' because 'the impact on [a plaintiff] is plainly undifferentiated and "common to all members of the public."'" *Lujan*, 504 U.S. at 575 (quoting *United States v. Richardson*, 418 U.S. 166, 171, 176–77 (1974)); *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153 (1970) (discussing prudential standing and the general inability to bring claims on behalf of others). Such is the case here. Treasury may not raise a generalized grievance on

behalf of taxpayers any more than a taxpayer could.[11]  Finding government standing for a harm to all taxpayers generally would render standing for nearly any governmental plaintiff seeking a declaratory judgment before it enforces the law.  This is so because any government enforcement action carries a risk of lawsuits by parties aggrieved, which inevitably comes at a cost to taxpayers.  Furthermore, much like the County, Treasury is distinguishable from the *MedImmune* claimant because it can choose to enforce *Exclusions* (and potentially face its feared injury) or not enforce it (and avoid those injuries altogether).

As was true for the County, Treasury's claimed threatened injuries are too speculative.  STAT had threatened six years prior that it would sue the County to challenge the ordinance for being unlawful.  But the panel reasoned that the County pled "nothing more than a 'speculative fear' that STAT might institute a lawsuit at some time in the future." *Saginaw Cnty.*, 946 F.3d at 955 (quoting *Clapper*, 568 U.S. at 410).  Treasury provides a similarly speculative theory to show its threatened injury:  if it enforces *Exclusions* to terminate employees, Chapter 73 could file a grievance and the FLRA may order (and the Circuit Court may affirm) reinstatement and backpay, which would result in the loss of value for the work

---

[11]  It is certainly understandable from an efficiency standpoint why Treasury may want to avoid the time, cost, and legal uncertainty associated with taking coercive action to enforce *Exclusions*.  But finding standing under those circumstances would open the door for any government entity to first seek authorization from a court before enforcing laws. *Saginaw Cnty.*, 946 F.3d at 957 ("A contrary rule would open the door to piecemeal adjudication, encourage contrived lawsuits, and require the federal courts to stare down countless advisory-opinion requests as government claimants rush to the federal courthouse for pre-enforcement advice.").  Crucially, such a result would undermine the separation of powers so carefully crafted by this country's founders.  The tension Treasury seeks to be free from was deliberately imposed and intentionally upheld.  Indeed, separation of powers exists not for efficiency's sake but to guard against excessive concentrations of power by any branch. *Bartkus v. People of State of Ill.*, 359 U.S. 121, 137–38 (1959) ("[S]eparation of powers was adopted in the Constitution not to promote efficiency but to preclude the exercise of arbitrary power.") (citation and quotations omitted).

during the period that the employees were terminated.  [Record No. 27 at 6]  But this theory rests on a series of hypothetical occurrences that lack the concreteness necessary to define the scope of the dispute to be fit for judicial review.  And such a "speculative chain of possibilities" fails to establish that Treasury's potential injury "is certainly impending or is fairly traceable" to Chapter 73.  *Clapper*, 568 U.S. at 414.

Indeed, it is possible that Chapter 73 files grievances in response to Treasury's hypothetical terminations, but it is also possible that it does not.  Yet if it does, it is possible the FLRA sides with the union and orders reinstatement, backpay, and attorneys' fees, but it is possible it does not.  And if the FLRA sides with the union and Treasury appeals to the Circuit Court, it is possible that the panel agrees with the FLRA, but it remains possible that it does not.  The Supreme Court has "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment" because it is "'just not possible for a litigant to prove in advance that the judicial system will lead to any particular result.'"  *Clapper*, 568 U.S. at 413–14 (quoting *Whitmore v. Arkansas*, 495 U.S. 149. 159–60 (1990)).  And such guesswork is what Treasury asks this Court to do.  Undoubtedly, Treasury would face legal uncertainty and expended funds and time associated with litigating the matter—but that alone is insufficient to show an Article III injury.  Deciding otherwise would generate standing for *any* government plaintiff's pre-enforcement request for declaratory relief.

The same is true for any injuries Treasury alleges that it faces by *not* repudiating the CBAs.  Unlike the claimant in *MedImmune* who faced ongoing royalty payments under the contract along with stiff penalties for breach, Treasury provides that it must continue using the grievance and bargaining process under the CBAs.  Which, it insists, interferes with its ability

to implement the Trump Administration's national security initiatives in a swift manner. While *MedImmune* did not directly confront the issue of whether existing contractual obligations could amount to an Article III injury, in the footnotes, the Court clarified that the limiting principle to its holding was the presence of coercion above and beyond any pre-existing requirement in the contract. *MedImmune, Inc.*, 549 U.S. at 120 n.9, 134 n.12 (explaining "the relevant coercion is not compliance with the claimed contractual obligation, but rather consequences of failure to do so"). Here, Treasury's alleged injuries stem from its compliance with the CBAs.

**Public Rights:** The "second way" of assessing Saginaw County's claims fared no better. The panel explained that the County, as a public body, "has authority that private companies and individuals do not." *Saginaw Cnty.*, 946 F.3d at 955. A government's sovereign right allows it to use lawful coercion to get "its way—by enacting a law on behalf of the people and enforcing it against unwilling residents." *Id.* This difference changes the calculus when it comes to actual injuries the government faces. For a government, actual injuries "do not conventionally arise until the government has enacted a law, enforced it against a resident, and the resident has refused to comply." *Id.* at 956. "[O]nly then, it would seem, does the sovereign sustain a cognizable injury—at least when it comes to enforcing public rights as opposed to enforcing the County's private contract or property rights." *Id.*

Supporting this conclusion, the panel referenced *United States v. West Virginia*, 295 U.S. 463, 471–72 (1935), which considered the United States' sovereign right "under the Constitution to control navigable waters." *Saginaw Cnty.*, 946 F.3d at 956. There, the sovereigns had a "difference of opinion" concerning whether certain bodies of water were

"navigable waters." *United States v. West Virginia*, 295 U.S. at 473. And both claimed a superior right to the waters based on their differing interpretations.

Regarding threatened injuries, the panel clarified that, "[u]ntil the [United States'] right asserted is threatened with invasion by acts of the state, which serve both to define the controversy and to establish its existence in the judicial sense, there is no question presented which is justiciable by a federal court." *Id.* Because the United States' sovereign right over navigable waters was not "threatened with invasion" (or actually invaded) by West Virginia, its Complaint for declaratory and injunctive relief raised an issue "too vague and ill-defined to admit of judicial determination." *Id.*; *Saginaw Cnty.*, 946 F.3d at 956. For Saginaw County, this meant that it was not injured in "an Article III way" by STAT's failure to comply with the ordinance. *Saginaw Cnty.*, 946 F.3d at 956 (citing *United States v. West Virginia*, 295 U.S. at 473). In summary, Article III only extends to situations in which the government enforces the law and then is confronted by an "actual or threatened invasion of its sovereign right to enforce the law." *Saginaw Cnty.*, 946 F.3d at 956.

While Treasury implies that it enforced[12] *Exclusions* in the 24 hours prior to the filing of this suit by ceasing union payroll deductions and ousting union stewards from agency office space, it does not contend that Chapter 73 somehow invaded (or threatened to invade) its sovereign right to enforce the Executive Order. [*See* Record Nos. 24 at 77–78 and 27 at 12.] Indeed, it provides "no persuasive evidence" nor points to any specific facts that it had enforced *Exclusions* against Chapter 73 when it filed its Complaint. *Ohio Nat. Life Ins. Co.*, 922 F.2d

---

[12] Even if the OPM Guidance (issued the same day as *Exclusions*) could be construed as Treasury enforcing *Exclusions* against Chapter 73, it still does not pass muster under *Saginaw County* because there was no actual or threatened invasion to Treasury's sovereign right to enforce *Exclusions*.

at 326.  Because Chapter 73 raises a factual attack to standing, no presumption of truth applies to Treasury's pleadings, and this Court must "weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist."  *Id.* at 325.

There are three issues with Treasury's omission.  First, if no enforcement was in effect (*i.e.*, no case or controversy) at the time the Complaint was filed, then Treasury sought an impermissible advisory opinion. Second, if enforcement had commenced, Treasury makes no showing that Chapter 73 invaded or threatened to invade its sovereign right to enforce the law. And third, it is Treasury's burden to show standing commensurate with the present stage of litigation.  Here, summary judgment requires more than *plausibly* alleging standing.  *Carman*, 112 F.4th at 399 (citing *Lujan*, 504 U.S. at 561).  While Treasury's Complaint provides that Chapter 73 "assuredly will not agree that the CBAs can be lawfully rescinded or repudiated," allegations "based merely upon assumed potential invasions of rights are not enough to warrant judicial intervention."  [Record No. 1 at ¶ 61]; *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 324–25 (1936).  By way of example, had Treasury attempted to oust union stewards from agency office space and those stewards refused or threatened to refuse, then there may have been standing to bring this suit.  But nothing in Treasury's Complaint, oral argument, or response to Chapter 73's Motion for Summary Judgment suggests that anything of the like had occurred at the filing of the Complaint.  To reiterate, it is Treasury's burden to point to "specific facts" at this stage of the litigation to show it has standing.  That it fails to do.

Perhaps acknowledging the shaky grounds on which it alleges standing, Treasury advances an alternate theory of harm in its response. *Compare* [Record No. 1 at ¶ 9] ("In light of the Executive Order . . . Plaintiff now seeks a declaratory judgment. . .that it has the power to rescind or repudiate [the CBAs].") *with* [Record No. 27 at 19] ("The Department's claim is

not based on signing of the Executive Order or any potential agency-wide recission of CBAs.").  It argues that the source of its injury occurred long before *Exclusions* was issued. The injury alleged is Chapter 73 enforcing the CBAs, which "currently restrict [Treasury] from managing its workforce under the current Administration's policies."  *Id.* at 8–9 ("At the time Complaint here was filed, the . . . Department suffered—and continues to suffer—"actual present harm" from Defendant's union activity within this district, as Chapter 73 is responsible for enforcing the CBAs against the Department here.").  It insists that the "injuries posed by the CBAs and their conflict with Executive Order 14,251 actually existed at the time the Complaint was filed and persist now."  *Id.* at 11.  Treasury argues that the harm it faces is Chapter 73's "threat of *enforcement*," (despite not pointing to any specific threat) of the CBAs' provisions.  (Emphasis in original); *Id.* at 8.  Treasury contends that Chapter 73 continues to act "under the belief that the CBAs remain valid," which is the present controversy.  *Id.* at 19. But standing is assessed at the filing of the Complaint, and neither the Court nor a litigant may use post hoc events to retroactively confer standing.

In making this threat of enforcement argument, Treasury overlooks its inherent sovereign power to enforce *Exclusions*.  It does not cite (and the undersigned cannot find) any case in which the *government* seeks a declaratory judgment premised on a non-sovereign's threat of enforcement against *the government*.  This is likely so because a government's sovereign right allows it to use lawful coercion to get its way, which makes it distinct from private parties.  *Saginaw Cnty.*, 946 F.3d at 955.  Further, as mentioned previously, *MedImmune* clarified that its holding did not cover claimed injuries from *existing* contractual obligations.  Simply put, Treasury attempting to hang its hat on Chapter 73's potential threat

of enforcing the CBAs (as written) stretches the requirement of actual or threatened injury too far.

Another useful case in distinguishing "private rights" and "public rights" as they pertain to sovereigns is *United States v. State of California*, 332 U.S. 19 (1947), *supplemented sub nom. United States v. California*, 332 U.S. 804 (1947). There, the United States filed a Complaint for declaratory and injunctive relief seeking a decree enunciating its right and power over "the lands, minerals and other things of value underlying the Pacific Ocean . . . on the coast of California." *See id.* Relying on *Unted States v. West Virginia*, California argued that the pleadings presented only a "difference of opinion" between sovereigns; and therefore, no case or controversy existed. *Id.* at 24–25. But the Court distinguished *Unted States v. West Virginia*, explaining that California already invaded the "right asserted by the United States" when it extracted and used oil from that coastal land. *Id.* at 25. As such, this represented "the kind of actual, concrete, actual conflict" that Article III authorizes courts to resolve. *Id.*

The Court also considered standing for the sovereign rights asserted. *Id.* The United States asserted two such rights: "to exercise power and dominion . . . to protect this country . . . incident to the fact that [it] is immediately adjacent to the ocean" and its responsibility to manage "relations with other nations." *Id.* at 28. The determination that the United States asserted the proper exercise of these constitutional responsibilities coupled with California's previous and ongoing extraction and use of shoreline oil, led the Court to declare that the United States had the "paramount right and power" over the land. *See id.* at 25, 29, 41.

That case does not change the result for Treasury because the "private right" controversy only existed once California *actually invaded* the United States' sovereign "public right" to control the shoreline. Likewise, assuming Treasury has a right to terminate its CBAs

pursuant to *Exclusions* and OPM Guidance, it still must show that Chapter 73 had actually invaded (or threatened to invade) that right at the time the Complaint was filed. *Ashwander*, 297 U.S. at 324–25 ("[A]ssumed potential invasions of rights are not enough to warrant judicial intervention."); *Christian Healthcare Centers, Inc.*, 117 F.4th at 849 (citations and quotations omitted). That Treasury fails to do.

The result is the same under *Public Utilities Commission of State of California v. United States*. 355 U.S. 534 (1958). Before California enacted the contested statute, common carriers were permitted to transport goods for the armed forces of the United States at reduced rates. *Pub. Utilities Comm'n of State of Cal. v. United States*, 355 U.S. 534, 537 (1958). After the statute, common carriers could only offer reduced rates with state Commission approval. *Id.* at 538. Violating this process could result in penalties (to both the carrier and the *shipper*) such as being "thrown into the county jail." *Id.* Further, the Commission had "plainly indicated an intent to enforce" the statute. *Id.* Therefore, "whether the United States ha[d] the right to obtain transportation service at such rates as it [could] negotiate or whether it [could] do so only with state approval" was a "present and concrete" controversy. *Id.*

In that case, the armed forces of the United States lost a right that it previously possessed (*i.e.*, the right to have equipment shipped at a reduced rate without state interference). Further, abiding by the new statute would almost certainly result in shipping delays because a proposed reduced rate first required Commission approval. *See id.* 544–45. Even more, failure to follow that statutory process could result in the responsible federal officials being thrown in the county jail. Such a stiff penalty coupled with the Commission's expression of its intent to prosecute was, therefore, sufficiently coercive.

- 33 -

Treasury has not pointed to any specific right that it once had but now has lost or is at risk of losing.  Nor does it identify any new burden placed upon it by Chapter 73.  Instead, it argues that the terms of the existing CBAs are the source of its injuries, *e.g.*, needing to participate in the grievance process and provide space and official time for union stewards under the CBAs.  [Record No. 27 at 8]  But it fails to provide support for how the status quo under those CBAs can confer Article III standing.  Again, because Treasury cannot merely allege injury from its pre-existing contractual obligations arising from the CBAs, it cannot show sufficiently coercive conduct engaged in or threatened by Chapter 73.

### (3)  Causal Connection and Redressability

The causal connection and redressability requirements for standing are best understood in tandem due to their interconnectedness.  *All. for Hippocratic Med.*, 602 U.S. at 380 ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.").  Standing requires "a causal connection between the injury and the conduct complained of" which means that the injury must be "'fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.'"  *Carman*, 112 F.4th at 399 (cleaned up) (quoting *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)));  *see also Allen v. Wright*, 468 U.S. 737, 757–58 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (explaining that it may be "substantially more difficult to meet the minimum requirements of [Article] III" when an injury stems from the actions of a third party).  Therefore, "if a plaintiff's injury does not derive from the purportedly unlawful conduct or provision, but instead from some other source, a plaintiff will lack standing."  *Carman*, 112 F.4th at 399.

- 34 -

Similarly, redressability requires that it "be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Lujan*, 504 U.S. at 561). More specifically, redressability requires that a declaratory judgment affect the "behavior of the defendant towards the plaintiff." *Safety Specialty Ins. Co.*, 53 F.4th at 1021 (quoting *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 971 (6th Cir. 2009)). To be sure, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107.

The inability of Treasury to identify a cognizable injury sufficient for Article III is further exemplified when applying the causation and redressability analyses. As an initial matter, counsel for Treasury clarified during oral argument that it sought a narrow scope of relief. Despite the apparent breadth of its Complaint, Treasury seeks a declaration that pursuant to *Exclusions* and OPM Guidance, it may rescind or repudiate the CBAs (2022 National Agreement, 2025 Addendum, and various local agreements) as applied *only* to Chapter 73—not NTEU or any other chapter. [Record No. 24 at 74–76] Treasury argues that because Chapter 73 is tasked with enforcing and implementing the CBAs in this district, it has *caused* Treasury's injuries, *i.e.*, filing grievances, requiring Treasury to provide space for union stewards and pay them during official time, and the CBAs' strictures. And therefore, if this Court declared that Treasury no longer needed to abide by the CBAs as they pertain to Chapter 73, its injury would be redressed.

Chapter 73 contends that it possesses no powers apart from its parent NTEU. In support of this contention, it references the NTEU's bylaws and constitution as well as the 2022 National Agreement regarding the role and authority of local chapters. [Record No. 22 at 2–

- 35 -

3]  It provides that NTEU is the exclusive representative for Treasury employees and holds exclusive bargaining rights.  *Id.* at 3.  Further, it argues that because NTEU is not a party to this matter, it would not be bound by the judgment, which means Treasury's injury will not be redressed.  *Id.* at 16.  Regarding Treasury's argument about backpay, Chapter 73 offers that beyond the CBAs, "terminated federal employees have numerous independent protections that could entitle them to backpay"; and therefore, declaratory relief will not redress that feared injury.  [Record No. 30 at 4] (citing 5 U.S.C. § 5596(b)).

If this Court granted the narrow declaratory relief as requested, Treasury's alleged injuries would not be redressed.  The onerous impediments the CBAs create would persist nationwide with only a small portion of IRS employees outside of the CBAs.  Treasury would still have to engage in the bargaining process and reductions in force requirements or risk being subject to serial grievances, reinstatements, backpay, and attorneys' fee awards.  It would still face legal uncertainty and potential "labor strife" despite a declaration in its favor.

## IV.  Conclusion

Notwithstanding its laudable goals, Treasury lacks standing to bring this action against Chapter 73.  Much like the declaratory judgment plaintiff in *Saginaw County*, looking to Treasury's claim under its private or public rights leads to the inescapable conclusion that "[e]ach one asks [this Court] to do something [it] cannot."  *Saginaw Cnty.*, 946 F.3d at 954.  *This decision says nothing of the merits of the case.*  Had Treasury filed suit in response to an invasion or threatened invasion of its sovereign right to enforce *Exclusions*, a different result likely would have been reached.  But the Court is bound by the timeline and facts before it.  Therefore, in finding no standing, there is no occasion to analyze any of the parties' other motions or claims.  Accordingly, it is hereby

- 36 -

**ORDERED** as follows:

1.     Defendant National Treasury Employees Union, Chapter 73's Motion for Summary Judgment [Record No. 22] is **GRANTED** to the extent it alleges that Treasury lacks standing but **DENIED** as moot to the extent it alleges an improper use of the Declaratory Judgment Act.

2.     The remaining pending motions: Defendant National Treasury Employees Union Chapter 73's Motion to Dismiss [Record No. 15] and Plaintiff United States Department of the Treasury's Motion for Summary Judgment [Record No. 12] are **DENIED** as moot.

Dated:  May 20, 2025.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky

- 37 -